# In the United States Court of Appeals for the Federal Circuit

DHS PROBATIONARY EMPLOYEES 1 CLASS, ROBERT HORTON, LILIA IRIZARRY, JEFFREY SMYLY,
*Petitioners,*

v.

DEPARTMENT OF HOMELAND SECURITY, DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT,
*Respondents,*

and

INTERIOR PROBATIONARY EMPLOYEES CLASS, ALLISON KEATING, MATTHEW MCANULTY, SAMUEL PETERSON,
*Petitioners,*

v.

DEPARTMENT OF THE INTERIOR, OFFICE OF PERSONNEL MANAGEMENT,
*Respondents.*

Petition for Review from the Merit Systems Protection Board in Nos. DC-0752-25-1781-I-1, DC-0752-25-1550-I-1

## BRIEF OF PETITIONERS

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
1400 16th Street, NW
Suite 225
Washington, DC 20036
(202) 888-1741

JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 625
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

*Additional counsel listed on the inside cover*

July 7, 2026                                                  *Counsel for Petitioners*

JOSEPH SELLERS
BRIAN C. CORMAN
REBECCA OJSERKIS
COHEN MILSTEIN SELLERS & TOLL
    LLP
1100 New York Avenue, NW
Suite 800
Washington, DC 20005
(202) 408-4600

EVE L. HILL
ANISHA S. QUEEN
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street
Suite 2500
Baltimore, MD 21202
(410) 962-1030

GARY M. GILBERT
KEVIN OWEN
SHANNON C. LEARY
CHRISTOPHER H. BONK
GILBERT EMPLOYMENT LAW, PC
8403 Colesville Road
Suite 1000
Silver Spring, MD 20910
(301) 608-0880

ALICE HWANG
DANIEL M. ROSENTHAL
CHARLOTTE SCHWARTZ
EMILY R. POSTMAN
JAMES & HOFFMAN, PC
1629 K Street, NW
Suite 1050
Washington, DC 20006
(202) 496-0500

# CERTIFICATE OF INTEREST

As required by Federal Circuit Rule 47.4, I certify the following:

1.  The full names of all parties represented by me are: Robert Horton, Lilia Irizarry, Jeffrey Smyly, DHS Probationary Employees 1 Class, Allison Keating, Matthew McAnulty, Samuel Peterson, and Interior Probationary Employees Class.

2.  The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3.  There are no parent corporations or publicly held companies that own 10% or more of the stock of any party represented by me.

4.  The names of all law firms and the partners and associates that appeared for the petitioners in the trial court or are expected to appear in this Court are:

Alice Hwang
Daniel M. Rosenthal
Charlotte Schwartz
Emily R. Postman
Sejal Singh
**James & Hoffman, P.C.**

Joseph Sellers
Brian C. Corman
Rebecca Ojserkis
Alisa Tiwari
**Cohen Milstein Sellers & Toll, LLP**

Gary M. Gilbert
Kevin Owen
Shannon C. Leary
Christopher H. Bonk
**Gilbert Employment Law, P.C.**

Jennifer D. Bennett
Thomas Scott-Railton
**Gupta Wessler LLP**

Eve L. Hill
Anisha S. Queen
**Brown Goldstein & Levy LLP**

5.  The petitioners know of no pending matters in this or any court that will directly affect or be directly affected by this Court's decision in this appeal.

July 7, 2026

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett

# TABLE OF CONTENTS

Certificate of interest.................................................................................................. i

Table of authorities .................................................................................................. iv

Statement of related cases................................................................................. xii

Introduction ................................................................................................................1

Jurisdictional statement.......................................................................................... 3

Statement of the issues ........................................................................................... 3

Statement of the case .............................................................................................. 4

    A.    Legal background............................................................................ 4

        1.    Reductions in force ....................................................... 4

        2.    Probationary employees............................................. 6

        3.    Merit Systems Protection Board jurisdiction ............................7

    B.    Factual background........................................................................ 8

        1.    The President and OPM direct agencies to shrink the workforce, starting with positions held by probationary employees that are not deemed mission critical......................... 8

        2.    DHS and DOI eliminate what they deemed non-essential positions held by probationary employees. .............................. 10

    C.    Procedural history ........................................................................ 16

Summary of argument........................................................................................... 19

Standard of review ..................................................................................................23

Argument ...................................................................................................................24

    I.    The MSPB had jurisdiction because the DHS and DOI employees were separated by reductions in force. ............................24

        A.    Agency actions to reduce headcount are reductions in force. ...............................................................................24

ii

B. DHS and DOI conducted reductions in force............................28

    1. MSPB jurisdiction depends on the substance of an employment action, not the agency's characterization. ...........................................................28

    2. The mass layoffs here were reductions in force. ............ 30

II. The administrative judge erred in concluding that DHS and DOI's actions to reduce headcount were not "reductions in force." ......................................................................................33

    A. The administrative judge erred in holding that these reductions in headcount did not target positions and therefore were not RIFs. ..........................................34

    B. Failing to follow RIF procedures does not render a RIF unreviewable. ........................................................... 40

    C. Terminations via RIF are reviewable even when probationary employees are involved. .....................................48

III. These large-scale restructurings of federal agencies created by Congress violate the separation of powers. ...........................................53

Conclusion ...........................................................................................56

# TABLE OF AUTHORITIES

**Cases**

*Bacon v. Department of Housing & Urban Development,*
757 F.2d 265 (Fed. Cir. 1985) ................................................... 32, 43, 47

*Baker v. DHS,*
99 M.S.P.R. 92 (2005) .......................................................... *passim*

*Barry v. McDonough,*
101 F.4th 1348 (Fed. Cir. 2024) ................................................ 24, 41

*Baxter v. United States,*
136 F. Supp. 748 (Ct. Cl. 1954) ....................................................... 26

*Biden v. Nebraska,*
600 U.S. 477 (2023) ................................................................. 55

*Bielomaz v. Department of Navy,*
86 M.S.P.R. 276 (2000) ............................................................. 8

*Blalock v. Department of Agriculture,*
28 M.S.P.R. 17 (1985) .............................................................. 29

*Bowsher v. Synar,*
478 U.S. 714 (1986) ................................................................ 54

*Brannan v. Elder,*
341 U.S. 277 (1951) ................................................................ 26

*Briggs v. MSPB,*
331 F.3d 1307 (Fed. Cir. 2003) ..................................................... 53

*Brittain v. Department of Army,*
11 M.S.P.R. 287 (1982) ............................................................. 43

*Carter v. Small Business Administration,*
23 M.S.P.R. 309 (1984) ............................................................. 41

*Cook v. Department of Interior,*
74 M.S.P.R. 454 (1997) ............................................................. 44

*Cramton v. Department of Treasury,*
    27 M.S.P.R. 558 (1985) ............................................................... 41

*Dixon v. United States,*
    67 F.4th 1156 (Fed. Cir. 2023) ....................................................23

*Elgin v. Department of Treasury,*
    567 U.S. 1 (2012) ........................................................................53

*FAA v. Cooper,*
    566 U.S. 285 (2012) .................................................................... 27

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
    561 U.S. 477 (2010) ............................................................... 23, 53

*Gandola v. FTC,*
    773 F.2d 308 (Fed. Cir. 1985) .............................................*passim*

*Garcia v. Department of Homeland Security,*
    437 F.3d 1322 (Fed. Cir. 2006) ............................................... 7, 24

*Grier v. Department of Health & Human Services,*
    750 F.2d 944 (Fed. Cir. 1984) .....................................................28

*Griffin v. Department of Agriculture,*
    2 M.S.P.B. 335 (1980) .................................................................43

*Hilton v. Sullivan,*
    334 U.S. 323 (1948) .................................................................4, 26

*Hilton v. Forrestal,*
    165 F.2d 251 (D.C. Cir. 1947) ................................................. 4, 25

*Himmel v. Department of Justice,*
    6 M.S.P.R. 484 (1981) .................................................................29

*Holley v. United States,*
    124 F.3d 1462 (Fed. Cir. 1997) ...................................................49

*Holmes v. Department of Army,*
    41 M.S.P.R. 612 (1989) ........................................................ 29, 42

*James v. Von Zemenszky,*
284 F.3d 1310 (Fed. Cir. 2002) ...........................................................................*passim*

*King v. Burwell,*
576 U.S. 473 (2015) ...........................................................................45

*Laden v. Crosson,*
108 F. Supp. 240 (E.D. Pa. 1952) ...........................................................................26

*Losure v. ICC,*
2 M.S.P.B. 361 (1980) ...........................................................................43

*Louisiana Public Service Commission v. FCC,*
476 U.S. 355 (1986)...........................................................................23, 54, 56

*Lowmack v. Department of Navy,*
80 M.S.P.R. 491 (1999) ........................................................... 8

*Marcoux v. USPS,*
63 M.S.P.R. 373 (1994) ...........................................................................29

*Marshall v. Crotty,*
185 F.2d 622 (1st Cir. 1950)...........................................................................26

*Maryland v. U.S. Department of Agriculture,*
770 F. Supp. 3d 779 (D. Md. 2025)........................................................... 32

*Maryland v. U.S. Department of Agriculture,*
777 F. Supp. 3d 432 (D. Md. 2025)...........................................................................45, 51, 52

*McGuffin v. SSA,*
942 F.3d 1099 (Fed. Cir. 2019)...........................................................................52

*Myers v. United States,*
272 U.S. 52 (1926) ...........................................................................53

*National Federation of Independent Business v. Department of Labor,*
*Occupational Safety & Health Administration,*
595 U.S. 109 (2022)...........................................................................53

*New York v. Kennedy,*
789 F. Supp. 3d 174 (D.R.I. 2025) ...........................................................................43

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)..................................................................... 23, 54

*O'Connell v. Department of Health & Human Services*,
21 M.S.P.R. 257 (1984)......................................................................43

*Ramspeck v. Federal Trial Examiners Conference*,
345 U.S. 128 (1953) ............................................................................26

*Robinson v. USPS*,
63 M.S.P.R. 307 (1994) ...............................................................*passim*

*Schall v. USPS*,
73 F.3d 341 (Fed. Cir. 1996)........................................................28, 31

*Tippins v. United States*,
93 F.4th 1370 (Fed. Cir. 2024).....................................................*passim*

*U.S. Department of Justice v. FLRA*,
709 F.2d 724 (D.C. Cir. 1983)...........................................................52

*U.S. ex rel. Rhodes v. Helvering*,
84 F.2d 270 (D.C. Cir. 1936) ............................................................26

*United States v. Connolly*,
716 F.2d 882 (Fed. Cir. 1983) .........................................................6, 51

*Welch v. Department of Army*,
323 F.3d 1042 (Fed. Cir. 2003) ......................................................... 31

*Wright v. FAA*,
11 M.S.P.B. 167 (1982) .......................................................................29

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...................................................................... 55, 56

## Constitutional provisions

U.S. Const. art. I, § 1.........................................................................53

## Statutes and legislative materials

5 U.S.C. § 901.....................................................................................54

5 U.S.C. § 903 ...................................................................... 46, 55

5 U.S.C. § 905 ...................................................................... 46, 55

5 U.S.C. § 906 ...........................................................................55

5 U.S.C. § 909 ...........................................................................55

5 U.S.C. § 3501 ............................................................................ 8

5 U.S.C. § 3502 ............................................................................5

5 U.S.C. § 7703 ............................................................................ 3

6 U.S.C. § 452 ...................................................................... 47, 55

Act of August 15, 1876,
19 Stat. 143......................................................................4, 25

Act of August 23, 1912,
37 Stat. 360 ....................................................................4, 25

Act of June 30, 1932,
Pub. L. No. 72-212, 47 Stat. 382 .......................................54

Act of March 3, 1933,
Pub. L. No. 72-428, 47 Stat. 1489......................................54

Act of September 6, 1966,
Pub. L. No. 89-554, 80 Stat. 428 .............................5, 25, 46

H.R. 1295, 119th Cong. (2025-2026)......................................55

H.R. 6787, 115th Cong. (2017-2018)......................................55

Reorganization Act of 1939,
Pub. L. No. 76-19, 53 Stat. 561..........................................54

Reorganization Act of 1945,
Pub. L. No. 79-263, 59 Stat. 613.........................................54

Reorganization Act of 1949,
Pub. L. No. 81-109, 63 Stat. 203 .......................................54

Reorganization Act of 1977,
Pub. L. No. 95-17, 91 Stat. 29................................................54

Reorganization Act Amendments of 1984,
Pub. L. No. 98-614, 98 Stat. 3192................................................54

S. 3137, 115th Cong. (2018)................................................55

S. Rep. No. 969, 95th Cong., 2d Sess. (1978)................................................6

Veterans' Preference Act of 1944,
58 Stat. 387................................................4, 25

## Rules and regulations

33 Fed. Reg. 12429
(Sept. 4, 1968) ................................................5, 26, 46

46 Fed. Reg. 3805-01
(Jan. 16, 1981)................................................25

90 Fed. Reg. 26729
(June 24, 2025) ................................................6

5 C.F.R § 11.2 ................................................6

5 C.F.R. (1945 Supp.) § 12.303 ................................................5

5 C.F.R. § 315.801................................................6

5 C.F.R. § 315.803 ................................................6, 51

5 C.F.R. § 315.804 ................................................7, 48, 51

5 C.F.R. § 315.805 ................................................7, 48, 49

5 C.F.R. § 315.806 ................................................7, 48

5 C.F.R. § 351................................................5

5 C.F.R. § 351.201 ................................................1, 5, 32, 44

5 C.F.R. § 351.202 ................................................8

5 C.F.R. § 351.203 ................................................*passim*

5 C.F.R. § 351.501 ................................................................5, 6, 8, 37

5 C.F.R. § 351.502 ..................................................................................5

5 C.F.R. § 351.503 ..................................................................................5

5 C.F.R. § 351.504 ..................................................................................5

5 C.F.R. § 351.505 ..................................................................................5

5 C.F.R. § 351.506 ..................................................................................5

5 C.F.R. § 351.801..............................................................................6, 8

5 C.F.R. § 351.901................................................................................*passim*

**Other authorities**

Executive Order. No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) .................9, 30, 35, 56

Executive Order No. 14284, 90 Fed. Reg. 17729 (Apr. 24, 2025) ................................. 6

Executive Office of the President of the United States,
   *Delivering Government Solutions in the 21st Century: Reform Plan and
   Reorganization Recommendations* (June 21, 2018)........................................................55

*Fit,*
   Random House Dictionary of the English Language (1st ed. 1968)...................50

*Fitness,*
   Webster's Third New International Dictionary of the English
   Language (3d ed. 1961) .........................................................................................50

*Layoff,*
   *Black's Law Dictionary* (12th ed. 2024) ...................................................................28

*Plan,*
   American Heritage Dictionary (1st ed. 1969).......................................................42

*Plan,*
   *Black's Law Dictionary* (4th ed. 1968) ...................................................................42

*Plan*,
  Webster's Third New International Dictionary of the
  English Language (3d ed. 1961) .......................................................... 41

Presidential Memorandum,
  90 Fed. Reg. 8247 (Jan. 20, 2025)........................................................ 8

Antonin Scalia & Brian A. Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012)................................................45

Tami Luhby, et al.,
  CNN, *Thousands of probationary employees fired as Trump administration directs
  agencies to carry out widespread layoffs* (Feb. 14, 2025) ........................................... 9, 56

The White House,
  *Fact Sheet: President Donald J. Trump Works to Remake America's Federal
  Workforce* (Feb. 11, 2025)....................................................................... 9

# STATEMENT OF RELATED CASES

The petitioners are unaware of any cases related to this appeal.

# INTRODUCTION

For well over a century, Congress has insisted that agencies must follow certain rules when they engage in large-scale reductions in their workforces, including preferences for veterans or longstanding employees. Throughout this time, Congress has enacted statutes using "reduction of force," "reduction in force," and "reduction in personnel" interchangeably to refer to agency actions to reduce headcount. So have regulations implementing those statutes promulgated by the Office of Personnel Management and its predecessor agency. And so have decisions from the Supreme Court, this Court, and the Merit Systems Protection Board.

In this case, at the direction of the incoming administration to shrink the size of their workforces, the Department of Homeland Security and the Department of the Interior undertook quintessential reductions in force (RIFs). The agencies identified positions they deemed non-mission critical that were held by probationary employees and then fired them by the thousands, completely independent of the employees' performance and conduct. The agencies had no plans to replace these employees whose positions they had found were unnecessary—after all, the whole point was reducing the size of their workforces by eliminating those jobs.

But the agencies did not comply with the regulations that agencies "shall follow" when undertaking RIFs, including the retention preferences dictated by Congress. 5 C.F.R. § 351.201(a)(2). That's despite the fact that these RIF regulations

1

apply to probationary employees and tenured employees alike. And the RIF regulations expressly grant the Merit Systems Protection Board jurisdiction over appeals of terminations based on reductions in force, including probationary employees. Accordingly, the fired DHS and DOI employees appealed their unlawful terminations to the MSPB.

Yet in a pair of decisions, the administrative judge held that the MSPB lacked jurisdiction. The judge recognized that the MSPB has jurisdiction over appeals by probationary employees terminated through reductions in force. She also recognized that whether an action is a RIF is judged by its substance, rather than the label given by the agency. And she acknowledged that it was undisputed that the mass firings here were taken to shrink the size of the workforce, were not based on individual performance or conduct, and that probationary employees were selected for termination based on the positions they held. That is the definition of a reduction in force over which the MSPB has clear jurisdiction.

In concluding otherwise, the administrative judge relied on a series of convoluted arguments that were contradicted by the same basic legal principles and undisputed facts that she recognized elsewhere in her opinions. She held that the actions here were not RIFs because the termination process supposedly was not based on employees' positions—even though she acknowledged that the firings were carried out pursuant to OPM's directive to shrink the size of the workforce by firing

probationary employees whose positions were deemed non-mission critical. The administrative judge relied on a circular argument that these mass terminations were not RIFs because they had not followed the procedures required for RIFs. And the administrative judge concluded that limits on the review of non-RIF terminations of probationary employees precluded MPSB jurisdiction here—even though she acknowledged elsewhere that the MSPB has jurisdiction over appeals by probationary employees terminated by RIFs.

None of these arguments warrant departing from the straightforward conclusion that these mass firings to reduce the size of the agencies' workforce were reductions in force, over which the MSPB has express jurisdiction.

The decisions below should be reversed.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over these consolidated appeals of final decisions by the MSPB. *See* 5 U.S.C. § 7703(b)(1). The MSPB had jurisdiction because the challenged actions were reductions in force. *See* 5 C.F.R. § 351.901.

## STATEMENT OF THE ISSUES

**I.** Whether DHS and DOI's reductions in headcount to reduce the size of the federal workforce were reductions in force, such that the MSPB had jurisdiction.

**II.** Whether large-scale restructurings without congressional authorization of federal agencies created by Congress violates the separation of powers.

## A. Legal background

### 1. Reductions in force

Congress has long imposed mandates on agencies about which employees may be terminated when an agency reduces the size of its workforce. "In 1876 … Congress passed a law which required any executive department when making 'any reduction of force' to 'retain those persons who may be equally qualified who have been honorably discharged from the military or naval service of the United States and the widows and orphans of deceased soldiers and sailors.'" *Hilton v. Sullivan*, 334 U.S. 323, 336 (1948) (quoting Act of August 15, 1876, 19 Stat. 143, 169).[1]

A subsequent 1912 statute provided veterans' preferences "in the event of reductions being made in the force in any of the executive departments." Act of August 23, 1912, 37 Stat. 360, 413. A 1944 law mandated retention preferences "[i]n any reduction in personnel in any civil service of any Federal agency." Veterans' Preference Act of 1944, 58 Stat. 387, 390. And regulations promulgated by the Civil Service Commission (OPM's predecessor) implementing these requirements established "retention preference[s] in reductions in force." *Hilton v. Forrestal*, 165 F.2d 251, 253 n.3 (D.C. Cir. 1947) (quoting 5 C.F.R. § 12.303 (1945 Supp.))).

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, emphases, and ellipses have been omitted from quotations throughout this brief.

The current version of the statute dates to 1966, when Congress directed the Civil Service Commission to promulgate "reduction in force" regulations. Act of Sept. 6, 1966, Pub. L. No. 89-554 § 3502(a), 80 Stat. 428, 428. Once again, Congress directed that the regulations must "give due effect" to employees' "tenure of employment," "military preference," "length of service," and "efficiency or performance ratings." *Id.* The Commission promulgated "Reduction in Force" regulations two years later to conform with the statute. *See* 33 Fed. Reg. 12429, 12429-33 (Sept. 4, 1968). These regulations have been amended over time, but, as relevant here, remain in force in substantially the same form. *See* 5 C.F.R. § 351. The current version encompasses a wide range of scenarios by which agencies may seek to reduce their headcount, including but not limited to a "lack of work," the "shortage of funds," an "insufficient personnel ceiling," or a "reorganization." 5 C.F.R. § 351.201(a)(2). A "reorganization" is further defined as the "planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203.

In such situations, an "agency shall follow" a suite of regulatory requirements. 5 C.F.R. § 351.201(a)(2). As mandated by Congress, these include retention preferences based on "tenure of employment, veteran preference, length of service, and performance." *Id.* § 351.501(a); *see also id.* §§ 351.501-506; 5 U.S.C. § 3502. An employee's probationary status is one of the factors considered in the retention

preferences. *Id.* § 351.501(b)(2). Agencies are also required to provide notice to employees prior to their release. *See* 5 C.F.R. § 351.801.

### 2. Probationary employees

Generally, when an employee is first hired to a position in the competitive service, they enter a probationary period. *See* 5 C.F.R. §§ 11.2, 315.801.[2] This requirement applies even to senior positions within the civil service; and it can apply even to long-serving government employees who change positions or are rehired after a break in service. *See id.* § 11.2(a)(2), (d), (e); *id.* § 315.801(a)(2), (e). The "probationary or trial period is an extension of the examining process to determine an employee's ability to actually perform the duties of the position." *United States v. Connolly*, 716 F.2d 882, 886 (Fed. Cir. 1983) (quoting S. Rep. No. 969, 95th Cong., 2d Sess. 45 (1978)). Agencies therefore must "utilize the probationary period as fully as possible to determine the fitness of the employee," and must "terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a).

---

[2] At the direction of President Trump, OPM has since changed the regulations governing the probationary period. *See* 90 Fed. Reg. 26729 (June 24, 2025); Exec. Order No. 14284, 90 Fed. Reg. 17729 (Apr. 24, 2025) ("Strengthening Probationary Periods in the Federal Service"). On June 24, 2025, OPM rescinded 5 C.F.R §§ 316.801-806. *See* 90 Fed. Reg. 26729. This brief cites to the prior regulations that were still in effect at the time of the challenged personnel actions. Appx38-39.

If an agency "decides to terminate" a probationary employee "because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment," it must provide notice "in writing as to why." 5 C.F.R. § 315.804(a) (in effect March 2025), reserved by 90 Fed. Reg. 26729 (June 24, 2025). If, on the other hand, an agency wishes to fire a probationary employee due to "conditions arising before his appointment," then it must provide specific notice of the proposed action, an opportunity to respond, and notice of adverse decision. 5 C.F.R. § 315.805 (in effect March 2025), *reserved by* 90 Fed. Reg. 26729 (June 24, 2025).

### 3. Merit Systems Protection Board jurisdiction

The Merit Systems Protection Board's jurisdiction is governed by statute and regulation. *See Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1327 (Fed. Cir. 2006) (en banc); 5 C.F.R. § 1201.3(a). MSPB review over terminations of probationary employees for lack of fitness for the role or conditions arising before employment is limited to allegations of discrimination or the failure to follow certain procedural requirements. *See* 5 C.F.R. § 315.806.

The MSPB also has jurisdiction over appeals by probationary employees separated due to a reduction in force. The regulations provide that "[a]n employee who has been … separated … by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901. And these regulations broadly govern

"each civilian employee in[] [t]he executive branch of the Federal government" subject to narrow exceptions not applicable here. 5 C.F.R. § 351.202(a)-(a)(1); *see also* 5 U.S.C. § 3501(b). That includes probationary employees, who are expressly covered by the RIF regulations. *See, e.g.*, 5 C.F.R. § 351.501(b)(2); *Bielomaz v. Dep't of Navy*, 86 M.S.P.R. 276, 280 (2000); *Lowmack v. Dep't of Navy*, 80 M.S.P.R. 491, 497-98 (1999). This means that, for example, the MSPB has jurisdiction to consider a claim by a probationary employee that the agency failed to give due consideration to their length of service or veteran status in a RIF. *See* 5 C.F.R. §§ 351.501, 351.801.

## B. Factual background

### 1. The President and OPM direct agencies to shrink the workforce, starting with positions held by probationary employees that are not deemed mission critical.

Immediately upon taking office, President Trump directed that the Office of Management and Budget work with the Office of Personnel Management to "submit a plan to reduce the size of the Federal Government's workforce." Presidential Mem., 90 Fed. Reg. 8247, 8247 (Jan. 20, 2025). To accomplish this rapidly, OPM identified probationary periods as a tool to "manage staffing levels," as OPM claimed that probationary employees could "be terminated … without triggering appeal rights to the Merit Systems Protection Board." Appx2701.

On February 11, 2025, President Trump signed an Executive Order that purported to "commence[] a critical transformation of the Federal bureaucracy."

Exec. Order. No. 14210, § 1 (Feb. 11, 2025), *reprinted in* 90 Fed. Reg. 9669 (Feb. 14, 2025). The order directed agency heads to "undertake preparations to initiate large-scale reductions in force" targeting "functions not mandated by statute" and "not typically designated as essential." *Id.* § 3(c).

The goal was to "significantly reduce the size of government" because, in the President's view, "[t]here are too many federal employees." The White House, *Fact Sheet: President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025), https://perma.cc/6G9M-VJHR. The White House emphasized that "reforming the federal workforce" was a "key priority." *Id.*

On February 14, 2025, OPM instructed agencies to "separate probationary employees that you have not identified as mission-critical no later than the end of the day Monday, 2/17." Appx2724; *see also* Appx2725 (stating that only probationary employees in "mission-critical areas should be retained"). OPM repeated the same in a February 14 follow-up email. Appx1486.

To the public and to agency officials, OPM emphasized that the probationary employee firings were "in support of the President's broader efforts to restructure and streamline the federal government." Appx2671 (quoting Tami Luhby, et al., CNN, *Thousands of probationary employees fired as Trump administration directs agencies to carry out widespread layoffs* (Feb. 14, 2025), https://perma.cc/VJ5B-FSV5). OPM told agency leaders that the probationary-employee terminations were designed to serve "the

9

President's directive to dramatically reduce the size of the federal workforce." Appx2724.

### 2. DHS and DOI eliminate what they deemed non-essential positions held by probationary employees.

In line with OPM's directives, the Department of Homeland Security and the Department of the Interior, like agencies across the government, undertook mass layoffs of probationary employees whose positions were deemed unnecessary. The agencies decided which probationary employees to terminate entirely based on the positions they occupied and the job duties they performed. No consideration was given to individuals' performance. Privately and publicly, agency officials confirmed that the probationary employees had been terminated as part of the massive effort to restructure the federal government. As the purpose of the firings was to shrink the size of the workforce, the agencies had no plan to replace any of the terminated probationary employees, and agency officials understood that those positions were accordingly being eliminated.

***Probationary employees are selected for termination based on position.*** Under OPM's marching orders, the agencies could only retain probationary employees who were in "mission-critical" positions. Appx2725; *see also, e.g.,* Appx2417. To determine whether to terminate an employee, therefore, the agencies focused entirely on the position the employee held. As DHS's Chief Human Capital Officer explained, the agency "look[ed] at the position description," and

"determined ... whether or not that function [was] actually required." Appx2395-2396; *see also* Appx1464 (agency determined which positions were necessary to perform each "statutory function ... at the required level").

DHS instructed its components to prepare justifications for "any occupations/categories of ... probationary employees that are critical to retain." Appx1277 (agency prepared written justifications for "positions" and "job series/occupations" that it had identified as "mission critical occupations"); *see also* Appx1626-1627 (same); Appx1476 (same). These "detailed justifications" for keeping employees were "for each position," Appx1282, or for "occupational series," Appx1629. And once "the Agency determine[d] what it need[ed] to do its business, that bec[ame] the determination of whether it's a mission-critical occupation or not." Appx1258. "Individuals in positions not determined to be mission critical were then selected for termination." Appx1297.

Similarly, DOI "reviewed all occupational series," determined which occupations were "categorically or commonly in support of National Security or Public Safety," and considered some additional "position-specific requests for exemptions." Appx2744-2745. Managers were told to identify the positions held by probationary employees that they wished to keep as one of the following: "immigration enforcement," "national security," "public safety," or "other critical need." Appx2728; *see also* Appx2735 (sorting exemption "requests by Occupation

Series"); Appx2731, Appx2737 (agency components should determine which probationary employees are "not critical"). A human capital officer later reviewed "all probationary positions" to "ensure consistency" in applying the definition of "National Security and Public Safety," and recommended exemptions "for 455 positions." Appx2741. Again, the justifications and the exemptions attached solely to the positions—they did not turn on any individual attribute of the employee. *See also* Appx2747-2763 (occupation justifications).

In its final accounting, DOI "considered 4,101 positions for action," "determined that an initial 2,261 positions would be exempt from termination," engaged in further "review of positions," "propos[ed] to exempt an additional 549 positions," which left "1,712 *positions* (42%) that *should be eliminated*." Appx2745 (emphases added).

At neither agency were the determinations of whether a position was deemed essential directed at any attribute of the individual employees—not their qualifications, their performance, or their conduct. *See* Appx1256-1257 (individual performance didn't "play into the determination"); Appx1259, Appx1464 (employees in positions that were deemed not "mission critical" were terminated "regardless of their performance"); Appx2782 (contemporaneous email stating that terminations of probationary employees were "not a reflection of their performance; they have been

remarkable contributors"); Appx2720 (agency admission that it conducted no individualized assessments).

***The agencies begin mass layoffs of probationary employees whose positions were deemed non-essential.*** On February 14, 2025, DHS and DOI began mass terminating the probationary employees whose positions they had deemed non-essential.

DOI terminated over 1,700 probationary employees. Appx2232, Appx2621. Its letters informing DOI employees that they had been summarily fired attributed the decision to employees' "subject matter knowledge, skills, and abilities." Appx2789. This came as a major surprise to at least one manager, who had told probationary employees mere hours before the notices were sent that they would receive "a generic email letting [them] know that this decision was made by the Department of the Interior based on workforce planning" and that the notices would "specifically say this is not a conduct or performance issue." *Id.* And this contravened the message sent by yet another manager, who communicated to his team that two "cherished members" had been fired due to "government-wide workforce initiatives," and that their "departure [was] not a reflection of their performance." Appx2782.

DHS laid off approximately 313 probationary employees. Appx1268. OPM had sent agencies a template termination letter for the mass firing of probationary employees, and DHS decided to adhere to it exactly. These notices stated in general

13

terms: "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." Appx1481. The notices did not disclose what the contemporaneous communications reveal and the government later admitted: that performance had nothing to do with it; the agency had decided to cut their position. *See* Appx1464. Months later, in response to a court order, DHS's Chief Human Capital Officer proposed telling the fired employees: "The termination letter you were issued was not due to performance- or fitness-based reasons as stated in the letter. The decision to terminate you was made as part of a government-wide mass termination." Appx1284.

***The agencies had no intention to refill the positions or to continue carrying out those functions.*** Because the goal of the personnel actions was to shrink the agencies' headcount and eliminate positions deemed non-essential, the agencies had no intention of refilling the positions or continuing to perform the functions and duties that were considered non-essential.

DHS "wanted to show" that it was "in alignment" with the "administration priority to reduce the government." Appx1233. In a press statement on the day of the firings, DHS was explicit about why it had terminated hundreds of probationary employees:

> Under President Trump's leadership, we are making sweeping cuts and reform across the federal government to eliminate egregious waste and

> incompetence …. Today's Department of Homeland Security personnel action will result in roughly $50 million in savings …. DHS component leads identified non-mission critical personnel in probationary status. We are actively identifying other wasteful positions and offices that do not fulfill DHS' mission.

Appx1275.

The DOI terminations served the same goal. Managers told employes at the time that they were being terminated at the direction of the new administration due to "government-wide workforce initiatives." Appx2782. Several DOI employees' "Notice of Personnel Action" for their terminations said in all caps: "Reason(s) for Termination: Based on Workforce Planning Directive from the Department of the Interior." Appx2791, Appx2793, Appx2795, Appx2797.

Because the point of firing the probationary employees was to downsize and streamline the federal government, that meant removing the positions—not just the people then occupying them. Neither DHS nor DOI had any "plan to replace" the terminated employees. Appx2439, Appx2710-2720, Appx2775. Neither agency expected to continue performing the positions' underlying functions. Appx2716. DOI admitted as much: In a memorandum summarizing the probationary employee removals, DOI described them as "positions" to "be eliminated." Appx2745.

Similarly, DHS human capital officers testified that because "the reason for those [terminations] was technically because they're no longer needed for mission purposes," Appx2384, the "billet ultimately goes away," Appx2417. And DHS's

Principal Deputy Chief of Staff explained the employment actions as "an opportunity to trim any organizational fat that is not critical to your mission." Appx1477. Agency officials involved understood the action as a reduction in force: A DHS Deputy Chief Human Capital Officer emailed multiple components asking for their "updated numbers from the actions on Friday/Saturday." Appx1210. The subject of this email was "RIF Numbers"—that is, reduction in force numbers. *Id.*

### C. Procedural history

**1.** Probationary employees at DHS and DOI challenged their terminations in class action appeals to the MSPB. They alleged that the firings of thousands of probationary employees because their positions were deemed non-mission critical were reductions in force that failed to follow RIF requirements. Appx1-2, Appx8-9, Appx29-30, Appx35-38. They also argued these actions were ultra vires in violation of the separation of powers. Appx2688-2689.

The administrative judge certified classes of DHS and DOI probationary employees who were terminated through these reductions in force. Appx5, Appx34. In both cases, the agencies challenged the Board's jurisdiction, asserting that their reductions in their workforces were not reductions in force. Appx2, Appx30. The parties then engaged in jurisdictional discovery, submitted evidence, and briefed the issue. Appx2, Appx30.

**2.** In both cases, the same administrative judge held that the MSPB lacked jurisdiction. The decisions contained substantially similar accounts of the facts and reasoning. The administrative judge reached these conclusions as a matter of law, holding that there were no material factual disputes. Appx15, Appx45-46.

The administrative judge recognized that "[t]he Board has jurisdiction over appeals filed by probationary … employees who are separated by RIF." Appx37. She also recognized that "[a]gencies may not circumvent RIF regulations in effecting the types of organizational change covered by the regulations." *Id.* Instead, courts must evaluate the substance of the action, as "[t]he label the agency ascribes to its action is not dispositive." *Id.*

The administrative judge also acknowledged various undisputed, key facts about the mass terminations. She noted that "[t]here is no dispute that the agency separated these employees because OPM directed it to do so." Appx33. She recognized that the employment actions here were taken "with the goal of shrinking [the] workforce." Appx15, Appx41. She also noted that it was undisputed that the employees were terminated "irrespective of their performance and conduct." Appx37. Instead, probationary employees were terminated based on whether they were "deemed to be in jobs the agency determined to be related to national security and public safety, again in compliance with direction from OPM." Appx33.

**3.** Despite this, the administrative judge held that these mass layoffs—where employees were fired based on their positions in response to instructions to shrink the federal workforce by eliminating unnecessary jobs—were not reductions in force.

The administrative judge held that these terminations were not RIFs because the process purportedly started with the employee's probationary status, rather than their position. Appx40-41, Appx43. According to the administrative judge, this order of operations was decisive, since RIFs are focused on "positions," and here the agency action "started with the character of the class member's appointment" as a probationary employee, before then determining whether to fire them based on their position. Appx43; *see also* Appx12. The administrative judge did not attempt to square this with her recognition that the agency actions started with directives from the incoming administration and OPM to reduce the federal workforce by cutting supposedly non-essential positions. Appx4-5, Appx33, Appx41.

The administrative judge also held that these firings did not meet the regulatory" definition of a reorganization because they were supposedly not "*planned* elimination[s]" or "[re]distribution[s]" of "functions or duties." Appx39-40 (quoting 5 C.F.R. § 351.203); Appx10. On this theory, the actions were not RIFs, because the RIF regulations require an agency to "follow a complex process for deciding how to allocate its employees and which ones will be released *after* it has first determined it has employees excess to its needs." Appx40. In other words, the administrative judge

believed that these actions were not RIFs because the agencies didn't follow what she understood to be the RIF rules.

Finally, the administrative judge asserted that the MSPB lacked jurisdiction because agencies have broad leeway to fire probationary employees and Board review of such terminations is limited. Appx12-13, Appx38-39. The administrative judge did not explain how this was consistent with her recognition that RIFs are an exception to the limitations on review of terminations of probationary employees. Appx37. The administrative judge also accepted the agencies' arguments that terminations to reduce headcount are based on an employee's "fitness," Appx13-14, Appx39, even though she recognized that it was undisputed the employees were not terminated based on their conduct or performance, Appx37.

## SUMMARY OF ARGUMENT

**I.** Text, history, and precedent all show that the agencies' actions to reduce headcount by eliminating purportedly unnecessary jobs were reductions in force and thus appealable to the Board.

Statutes and regulations have long employed the term "reduction in force" to cover agency reductions in headcount. *See infra* 25-27. Consistent with this, this Court has recognized that agencies conduct reductions in force when they act to eliminate jobs "to reduce the manpower" of their agencies. *Gandola v. FTC*, 773 F.2d 308, 312 (Fed. Cir. 1985); *see also, e.g.*, *Tippins v. United States*, 93 F.4th 1370, 1375 (Fed. Cir. 2024).

Here, even on the administrative judge's account of the undisputed facts, these were reductions in force under the term's longstanding meaning. The administrative judge found that the purpose of the probationary layoffs was to "shrink the size of [the] workforce." Appx41; *accord* Appx15. It was undisputed that employees were not terminated because of "their performance [or] conduct," but instead because their positions were deemed non-mission critical. Appx33, Appx37. And because the goal of the actions was to reduce the size of the agencies' workforces by terminating employees in purportedly unnecessary positions, there was no intention of replacing them—that would have defeated the point. *See, e.g.*, Appx2745 (summarizing the terminations as "a total of 1,712 *positions*" that would "be *eliminated*"); Appx1278, Appx1300. Those are reductions in force.

These mass terminations also meet the regulatory definition of a reorganization—one of the recognized bases for a RIF under the regulations. A reorganization is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203. Here, the agencies deliberately acted to eliminate functions and duties that they saw as unnecessary, and the agencies terminated the employees who performed them with no intent to replace them. *See supra* 8-16. That is plainly a reorganization, and accordingly a RIF.

**II.** The administrative judge erred in concluding that these reductions in the workforce were not, in fact, reductions in force.

*First*, the administrative judge incorrectly held that these actions were not targeted at positions. Appx12, Appx43. It was undisputed that the employees here were terminated based on the agencies' determination that the positions they held were unnecessary. *See supra* 10-14. And, regardless, this Court's precedent makes clear that an agency action to reduce headcount constitutes a RIF even if the agency considers characteristics of individual employees when deciding which positions to eliminate. *See Gandola*, 773 F.2d at 309. Similarly, the "elimination" or "redistribution" of "functions or duties" considered to be non-critical is a reorganization under the regulations. 5 C.F.R. § 351.203.

*Second*, the administrative judge erroneously concluded that these actions were not RIFs because they did not follow the procedural requirements for RIFs or involve formal "reorganization plan[s]." Appx10, Appx43. But it is the substance of employment actions that governs—not the agency's labels or terminology—and agencies cannot evade the regulations governing RIFs simply by not following them. *See, e.g.*, *Baker v. DHS*, 99 M.S.P.R. 92, 95 (2005); *Robinson v. USPS*, 63 M.S.P.R. 307, 324 (1994).

The administrative judge was also mistaken to conclude that these mass firings were not "planned" and therefore could not be a reorganization. Appx10, Appx40; *see* 5 C.F.R. § 351.203 (defining reorganization to include "the planned elimination … or redistribution of functions or duties"). An action is "planned"

when it is aimed for or intended or schemed out, regardless of whether a formal plan is detailed in writing. *See infra* 41-42 (compiling dictionaries). That is precisely what happened here. Even on the administrative judge's account, the agencies acted pursuant to OPM's instructions to reduce the workforce by targeting positions that the agencies deemed non-essential, held by probationary employees. Appx40-41; *see also* Appx4-5, Appx9-10. In other words, the agencies "planned" to reduce headcount, and only *then* terminated the probationary employees who occupied supposedly non-mission critical positions.

*Third,* the administrative judge erred in holding that these mass reductions in force were not reviewable because of limits on Board review of for-cause terminations of probationary employees. Appx12-13, Appx38-39. The RIF regulations expressly grant the MSPB jurisdiction to review terminations by RIF, including the termination of probationary employees. 5 C.F.R. § 351.901. Indeed, the administrative judge acknowledged as much. Appx37. So if these firings were RIFs—which they were—the Board had jurisdiction. Nothing in the separate limits on the Board's jurisdiction to review *other* kinds of individualized non-RIF employment decisions regarding probationary employees can change this clear grant of MSPB jurisdiction over RIF actions.

In sum, none of the reasons given by the administrative judge justify departing from a straightforward application of the longstanding meaning of reduction in force.

**III.** While the conclusion that the agencies' actions were reviewable RIFs is sufficient to warrant reversal, these attempts to conduct a large-scale restructuring of agencies that Congress created were also a violation of the separation of powers. "Congress has plenary control over the … duties[] and even existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010). In contrast, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And that limitation is especially important here given "long settled and established practice," *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014), that when Congress has wished to delegate its power to restructure agencies to the executive branch, it has provided explicit statutory authorization. *See infra* 54 (compiling statutes). Congress has not done so here, and these attempts to wrest away power from the legislative branch that it has not deigned to provide are a violation of the Constitution's separation of powers.

## STANDARD OF REVIEW

This Court reviews "de novo the correctness of a dismissal for lack of jurisdiction" when the determination "was not determined based on resolution of factual disputes." *Dixon v. United States*, 67 F.4th 1156, 1165 (Fed. Cir. 2023).[3]

---

[3] Because of slightly different procedural histories, the administrative judge held in the DHS case that the employees had failed to show by a preponderance of

## ARGUMENT

### I. The MSPB had jurisdiction because the DHS and DOI employees were separated by reductions in force.

"An employee who has been … separated … by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901. That's precisely what happened here: DHS and DOI reduced their workforces by eliminating thousands of positions. The Board therefore had jurisdiction.

#### A. Agency actions to reduce headcount are reductions in force.

As its name suggests, a "reduction in force" encompasses a reduction in the size of an agency's workforce—a reduction in headcount. Indeed, that's how Congress, agencies, courts, and private industry have understood the term for over a century. Nothing in the regulation granting the MSPB jurisdiction over reductions in force suggests that it deviates from this ordinary meaning.

**1.** The "first" step when "interpreting a regulatory provision" is examining the "language itself to determine its plain meaning." *Barry v. McDonough*, 101 F.4th 1348, 1352 (Fed. Cir. 2024). OPM's "Reduction in Force" regulations provide that an

---

the evidence that the MSPB had jurisdiction—but stated that it "would have been a closer call" whether the employees had "made nonfrivolous allegations" of jurisdiction. Appx15. In the DOI case, however, the administrative judge held that the employees had failed to nonfrivolously allege that the terminations were RIFs. Appx37. Given that the nonfrivolous allegation standard requires only "an allegation of fact which, if proven, could establish a prima facie case that the Board has jurisdiction," the need for reversal in the DOI case is even clearer. *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1339 (Fed. Cir. 2006).

employee separated by a "reduction in force" can appeal to the Board. 5 C.F.R. § 351.901. When this regulation was promulgated in 1981, "reduction in force" had a well-established meaning in this statutory and regulatory context that encompassed reductions in agency headcount. 46 Fed. Reg. 3805-01 (Jan. 16, 1981).

For decades, Congress and OPM's predecessor had used the terms "reduction in force," "reductions being made in the force," and "reduction in personnel" interchangeably to encompass reductions in headcount and to establish certain preferences when agencies were doing so. In 1876, Congress used "reduction of force" to require preferences for veterans when agencies were reducing the size of their workforces. Act of August 15, 1876, 19 Stat. 143, 169. Congress then again used "reductions being made in the force in any of the executive departments" and "any reduction in personnel" in subsequent statutes to regulate reductions in the size of the workforce and establish retention preferences based on criteria such as military service or length of government service. Act of August 23, 1912, 37 Stat. 360, 413; Veterans' Preference Act of 1944, 58 Stat. 387, 390 (1944).

These statutes were implemented by OPM's predecessor through regulations that used the term "reductions in force" to refer to these scenarios. *Hilton*, 165 F.2d at 253 n.3. And Congress then employed that term in enacting the operative statute in 1966—again to mandate retention preferences for reductions in the size of the workforce. Pub. L. No. 89-554 § 3502(a), 80 Stat. 428 (Sept. 6, 1966). The agency then

updated and promulgated its "Reduction in Force" regulations to conform with that statute. *See* 33 Fed. Reg. 12429 (Sept. 4, 1968).

Similarly, for decades prior to 1981, cases applying those statutes and regulations used terms like "reduction in the number of government civilian employees," "reduction in force," and "reduction in force of government personnel," interchangeably to refer to decreases in the size of the workforce. *Hilton*, 334 U.S. at 325-26, 337; *see Baxter v. United States*, 136 F. Supp. 748, 750 (Ct. Cl. 1954) ("reduction in force" where, even though term was not used, it was "clear from the evidence" that action was taken "to reduce the total number of personnel"); *Laden v. Crosson*, 108 F. Supp. 240, 242-43 (E.D. Pa. 1952) (holding that a "sweeping reduction in personnel tak[ing] place as a result of a policy directed to that end" was "a reduction in force no matter what name may be given to it"); *Marshall v. Crotty*, 185 F.2d 622, 625-26 (1st Cir. 1950) (using "reduction in personnel" and "reductions in force" interchangeably); *Brannan v. Elder*, 341 U.S. 277, 283-85 (1951).

Consistent with this, when assessing personnel actions that shrunk agencies, courts routinely referred to these as "reductions in force" and applied reduction-in-force rules. *See Hilton*, 334 U.S. at 325-26 ("program of reduction in the number of government civilian employees"); *U.S. ex rel. Rhodes v. Helvering*, 84 F.2d 270, 271 (D.C. Cir. 1936) (1933 action to "reduce the personnel in the Bureau of Internal Revenue"); *Ramspeck v. Fed. Trial Exam'rs Conf.*, 345 U.S. 128, 142 (1953) (discussing how, under

26

"reduction in force" regulations, an agency could undertake reductions in force when "there are a lesser number of [employees] necessary at this time").

When a statute or regulation "employs a term of art," courts presume that it takes on "the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 566 U.S. 285, 291-92 (2012). When the reduction-in-force regulations were promulgated, it was already well established that agency layoffs—that is, a reduction in an agency's headcount—constitute a reduction in force.

**2.** That understanding is no different today. As this Court has explained, "[w]hen a company fires one worker and replaces him with another, there is no net loss in the number of employees and no 'reduction in force' as the term is commonly understood." *Tippins*, 93 F.4th at 1376. But when the agency actually acts "to reduce the manpower" of their agencies, that is a reduction in force. *Gandola*, 773 F.2d at 312; *see, e.g.*, *Tippins*, 93 F.4th at 1376; *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). This Court, therefore, has "consistently defined a 'reduction in force'" in accordance with its long-held understanding "as an administrative procedure by which agencies eliminate jobs and … separate employees who occupied the abolished positions." *Tippins*, 93 F.4th at 1375; *see also, e.g.*, *James*, 284 F.3d at 1314. That matches its ordinary meaning as well. *See, e.g.*, *Layoff, Black's Law Dictionary* (12th ed.

2024) (a "reduction in force" is synonymous with a "layoff" that is usually "through no fault of the employee" and especially "of many employees in a short time").

This Court has contrasted such structural changes with an adverse action that targets a "particular employee" who held the position. *James*, 284 F.3d at 1314. The latter aims to "remov[e]" a "particular individual[]" from federal service. *Grier v. Dep't of Health & Human Servs.*, 750 F.2d 944 (Fed. Cir. 1984). Commonly, that removal is motivated by the employee's "conduct or performance," rather than the "position" the employee occupies. *Schall v. USPS*, 73 F.3d 341, 344 (Fed. Cir. 1996).

In sum, text, history, and precedent all demonstrate that a "reduction in force" covers agency actions taken to reduce headcount.

## B. DHS and DOI conducted reductions in force.

DHS and DOI's mass terminations of employees to reduce headcount, based on the positions they held rather than individual performance or conduct, were quintessential reductions in force.

### 1. MSPB jurisdiction depends on the substance of an employment action, not the agency's characterization.

It is "well-settled" that the substance of an agency's personnel action, not the label the agency ascribes to it, determines the Board's jurisdiction. *Baker v. DHS*, 99 M.S.P.R. 92, 95 (2005). "'It is the essential nature of the action—i.e., whether the action is in the nature of a RIF action or in the nature of an adverse action—that determines' how the action should be characterized for jurisdictional purposes." *Id.*

28

(quoting *Marcoux v. USPS*, 63 M.S.P.R. 373, 378 (1994)). The agency's "characterization of an action" is therefore not dispositive. *Id.* at 95; *see also, e.g., James*, 284 F.3d at 1313-15 (agency action was subject to RIF regulations even though agency did not acknowledge the action as a RIF); *Blalock v. Dep't of Agric.*, 28 M.S.P.R. 17, 21 (1985), *aff'd sub nom. Huber v. MSPB*, 793 F.2d 284 (Fed. Cir. 1986) ("The Board must look beyond the reason stated by the agency."); *Wright v. FAA*, 11 M.S.P.B. 167, 167-68 (1982) (finding employee subjected to RIF because position was abolished due to lack of work despite agency treating as adverse action); *Himmel v. Dep't of Just.*, 6 M.S.P.R. 484, 486 (1981). The same goes for whether the agency conducted a "reorganization," which requires looking to "the totality of the evidence" to determine what in "substance" occurred. *Blalock*, 28 M.S.P.R. at 20-21; *see also Holmes v. Dep't of Army*, 41 M.S.P.R. 612, 615 (1989). Even the administrative judge acknowledged as much. Appx37.

This principle ensures that an agency may not circumvent the reduction-in-force regulations. *See, e.g., Robinson*, 63 M.S.P.R. at 324. Congress insisted that an agency honor statutorily mandated retention preferences and procedures, and the regulations implemented Congress's directive. This structure would be vitiated if the reorganizing agency could simply decide to "disregard[] applicable statutory and regulatory provisions" by calling a reduction in force by another name. *Id.* at 324-25.

## 2. The mass layoffs here were reductions in force.

DHS and DOI's mass layoffs were reductions in force under the longstanding meaning of the term. The administrative judge found that the purpose of the probationary layoffs was to "shrink the size of [the] workforce." Appx41; *accord* Appx15. And with good reason: OPM told agency leaders that the terminations were designed "to dramatically reduce the size of the federal workforce." Appx2724; *see also supra* 8-10. And agencies themselves understood the terminations to be part of the "government-wide" effort to reduce the government's footprint. Appx2782. Indeed, the government has never seriously disputed that the probationary employee layoffs were in service of reducing the agencies' workforces.

To accomplish this goal, the agencies conducted mass layoffs based on the positions employees occupied. As the administrative judge recognized, it's undisputed that employees were not terminated because of "their performance [or] conduct." Appx37. Instead, they were fired because of their roles. Appx33. Even the government below admitted that "[i]ndividuals were separated *solely* because they were deemed to not be mission critical." Appx2850 (emphasis added). And once again, it would have been hard to do otherwise. The administration touted its "critical transformation of the Federal bureaucracy" by eliminating "functions not mandated by statute" and "not typically designated as essential." Exec. Order. No. 14210, §§ 1, 3 (Feb. 11, 2025), *reprinted in* 90 Fed. Reg. 9669 (Feb. 14, 2025). Probationary

employees were terminated if their positions were not deemed "mission critical." *See* Appx1278-1281, Appx2725. To do so, the agencies evaluated the need for "occupations" "categories," "positions," and "job series." Appx1276-1277, Appx1464, Appx1626-1629, Appx2728-2729, Appx2735, Appx2744-2745.

The purpose was not to replace the terminated employees with others; it was to eliminate their purportedly unnecessary jobs. *See, e.g.*, Appx1300 (admitting there was no plan to replace the employees); Appx2775 (similar). As a human capital officer at DHS stated, any "billet" held by a probationary employee fired as part of this action "ultimately goes away." Appx1278. And DOI summarized the terminations as "a total of 1,712 *positions*" that would "be *eliminated*." Appx2745 (emphases added). That's why DHS told the public that the firings were "sweeping cuts" which would "result in roughly $50 million in savings for American taxpayers." Appx1275. The jobs—not just the employees who had held them—were gone.

Given the above, these actions were quintessential reductions in force under the term's longstanding meaning and this Court's caselaw. The "agencies eliminate[d] jobs," *Tippins*, 93 F.4th at 1375, with the undisputed goal of "reduc[ing] the manpower" of their agencies. *Gandola*, 773 F.2d at 312; *see also, e.g.*, *James*, 284 F.3d at 1314. They did so by targeting employees in "position[s]" deemed unnecessary; they did not fire anyone because of their individual "conduct or performance." *Schall*, 73 F.3d at 344; *see also, e.g.*, *Welch v. Dep't of Army*, 323 F.3d 1042, 1046 (Fed. Cir. 2003).

And the agencies had no "intent to refill" the positions they had just deemed unnecessary. *Tippins*, 93 F.4th at 1374. Indeed, another court has already concluded that these layoffs were, in fact, a reduction in force. *See Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 808-12, 822 ("*Maryland I*") (D. Md. 2025).

The agencies' mass firings also meet the definition of a "reorganization," which is one of the bases the regulations recognize for RIF. A reorganization is "the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203.[4] As this Court has recognized, that "clearly" includes firings because an agency determines it is "overstaffed." *Bacon v. Dep't of Hous. & Urb. Dev.*, 757 F.2d 265, 269 (Fed. Cir. 1985). And that stands to reason: When an agency shrinks its headcount, the functions and duties performed by those employees are necessarily either redistributed to remaining employees or eliminated. Here, the agencies expressly targeted functions and duties that they deemed unnecessary, firing employees who performed those functions and duties without any intent to replace them. *See supra* 10-16. That is a reorganization, and accordingly a RIF under the regulations.

In sum, the agencies' actions were reductions in force and therefore the

---

[4] The ostensible basis for these terminations—that the work performed is unnecessary under the statute, *see supra* 8-14—are also in substance an assertion that the terminations are warranted due to a "lack of work," another basis for a RIF. 5 C.F.R. § 351.201(a)(2).

employees terminated by these reductions in force "may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901.

## II. The administrative judge erred in concluding that DHS and DOI's actions to reduce headcount were not "reductions in force."

The administrative judge erred in rejecting this straightforward application of the term "reduction in force."

*First*, the administrative judge held that these reductions in agency workforces were not RIFs because they supposedly did not target positions. But the terminations here *did* target positions: Employees were fired specifically because of the purportedly unnecessary positions they held.

*Second*, the administrative judge held that the actions here were not RIFs because they did not follow RIF requirements, such as announcing that the agency is undertaking a RIF. This circular argument, which would permit an agency to evade RIF rules simply by not following those rules, is foreclosed by precedent. Similarly, the administrative judge concluded that the actions were not sufficiently "planned," which is both contrary to that term's meaning and in any event would reward agencies for undertaking half-baked mass layoffs.

*Third*, the administrative judge held that the actions here were not reviewable because agencies generally have wide latitude to fire probationary employees and such decisions are generally nonreviewable. Yet the regulations expressly provide for

review of probationary employees fired in RIFs, which is a clear exception to that general principle.

Accordingly, none of the reasons given by the administrative judge warrant treating these reductions in force as anything other than reductions in force, which are expressly reviewable.

### A. The administrative judge erred in holding that these reductions in headcount did not target positions and therefore were not RIFs.

The administrative judge acknowledged that the employment actions here were taken "with the goal of shrinking [the] workforce." Appx15, Appx41. Yet she nonetheless concluded that these actions to reduce the workforce were not reductions in force because employees were supposedly targeted because they were during a probationary period, rather than by position. Appx41. That was incorrect several times over.

**1.** The record here shows that the agencies *did* determine who would be fired based on position, even under the administrative judge's understanding of what it means to target a position. Simply put, whether an employee was terminated or not depended on the nature of the position they occupied and the duties they performed. *See supra* 10-14. Pursuant to OPM's directive, the agencies could only retain probationary employees in "mission critical" roles. *See* Appx1278-1280, Appx2725. In both DHS and DOI, agency officials determined which employees would be

34

terminated based on evaluating whether their positions fell within certain categories or were otherwise essential. *See, e.g.*, Appx1256-1257, Appx1276-1277, Appx1297, Appx2744-2745, Appx2727-2729. "Individuals in positions not determined to be mission critical were then selected for termination." Appx1297.

The administrative judge discounted this evidence because the employment actions had supposedly "started" with probationary status, which she did not consider to be targeting positions. Appx12, Appx43. But as even the administrative judge acknowledged, the terminations here began with directives from the incoming administration and OPM to reduce the federal workforce by cutting non-essential positions. Appx4-5, Appx33, Appx41. The President had signed an Executive Order to target "functions not mandated by statute" and "not typically designated as essential" to "reduce the size of the Federal Government[]." Exec. Order. No. 14210, § 1. OPM then told agencies that probationary employees who were not in "mission critical areas" must be separated. Appx1216, Appx2722; *see also* Appx1486, Appx2725. Accordingly, the actions started with the goal of shrinking the workforce—a quintessential basis for a reduction in force—by removing non-mission critical positions, which was effectuated by terminating probationary employees whose positions were not deemed critical. This "elimination" (or, at a minimum, "redistribution") of "functions or duties" considered to be non-critical is also a quintessential reorganization. 5 C.F.R. § 351.203.

Even beyond this error, narrowly focusing on which step formally came first in the process cannot be squared with the requirement that courts look at substance over form in determining whether something is a RIF. *See supra* 28-29. Whether an agency first took a list of non-mission critical positions and then identified all those held by probationary employees, or took the list of probationary employees and then exempted all mission critical positions, the "essential nature of the action" is the same: Termination decisions were made based on position. *Baker*, 99 M.S.P.R. at 95. And there is no basis in the regulations for concluding that the protections and preferences required by Congress would not apply to mass reductions in headcount based solely on this formalistic difference.

**2.** More fundamentally, firing employees to systematically shrink the size of the workforce is a quintessential reduction in force, even if one stage of the process involves consideration of characteristics like the nature of the employee's appointment. The whole point of such an action is to reduce headcount, which is the definition of a reduction in force. *See supra* 24-28. Similarly, the agencies were—even on their own terms—seeking to eliminate what they deemed unnecessary roles, which is the definition of a reorganization: the "planned elimination … or redistribution of functions or duties in an organization" 5 C.F.R. § 351.203.

This Court's precedent confirms as much. For example, in *Gandola*, the agency was pursuing a reorganization under which "the size of each regional office would

be reduced to a maximum of 18 employees." 773 F.2d at 309. When "deciding which positions to eliminate in the regional offices," agency officials "considered the employees' experience, individual effectiveness, and personal abilities." *Id.* This Court held that the resulting terminations were still precipitated by a reduction in force. *Id.* at 311-13. "[N]othing … in the language or legislative history of that statute or the implementing regulations … specifically bars an agency from considering the abilities of individual employees in determining which positions to eliminate in a reduction in force." *Id.* at 311. In other words, an agency action to reduce headcount is still a RIF when it involves consideration of personal characteristics of the employees when deciding which positions to eliminate. Indeed, this is an even easier case, as consideration of appointment status is considerably less individualized than the consideration of individuals' specific abilities in *Gandola*.

Further, the process required by the RIF regulations itself takes into account individual characteristics—including probationary appointment—in determining who will be fired. Once an agency has determined it will reduce headcount, the process for determining retention takes into account employee characteristics like "probationary period" and prioritizing separating those employees over certain others. 5 C.F.R. § 351.501(b). The RIF regulations, in other words, *require* that when an agency is eliminating a portion of its workforce, it must do so in a way that reflects characteristics such as appointment status. It therefore cannot be the case that taking

37

into account appointment in determining who will be fired categorically disqualifies an action from being a RIF. And here, even on the administrative judge's account, the agencies decided to reduce headcount and then took into account appointment status in deciding which employees would be fired. *See supra* 35. That is the same in substance to a traditional RIF, and it is the substance that matters. *See, e.g.*, *Baker*, 99 M.S.P.R. at 95. The only difference is that the agencies imposed OPM's preferences, not those required by Congress and the regulations.

Any other rule would render the RIF requirements self-defeating. An agency could dramatically reduce its size through mass firings without complying with the RIF regulations so long as it initially identified the positions to eliminate by picking those held by probationary employees whose names start with the letters A through Y. Under the approach adopted by the decisions below, that would not be a reduction in force because it would have "started by targeting the characteristics of individual employees." Appx12, Appx42-43. Yet a core purpose of both the statutes and regulations is to ensure that retention preferences (including an employee's probationary status) are followed when the government reduces its workforce. *See supra* 24-26. That would be vitiated if agencies could evade these rules simply by prioritizing the elimination of positions in a different order (such as by starting with an employee's probationary status). *See, e.g.*, *Robinson*, 63 M.S.P.R. at 324. An agency may not "ignor[e] the objective factors whose consideration is mandated by statute

and by the RIF regulations—factors such as preference-eligibility, seniority, and official performance evaluations"—just because it prefers to "substitute" its own preferences. *Robinson*, 63 M.S.P.R. at 325.

**3.** Finally, the administrative judge relied on this Court's decision in *Tippins*, 93 F.4th 1370, but that decision only further shows why the actions here were RIFs. In *Tippins*, the Coast Guard had become "concerned about high retention among retirement-eligible enlisted personnel and the resulting lack of advancement opportunities for high performing junior enlisted personnel." 93 F.4th at 1372. To address this, the Coast Guard involuntarily retired many "enlisted personnel with 20 or more years of experience." *Id.* But it didn't do so to shrink the size of the workforce; it acted "simply to make room for others to be installed in the positions instead." *Id.* at 1375.

Here, the record shows the opposite: DHS and DOI had no "intent to refill" the positions of terminated employees. *Id.* There was no "plan to replace" them. Appx1300, Appx2775. After all, the whole point of the terminations was to reduce the size of the workforce by getting rid of employees in positions that were "no longer needed." Appx1244-1245. That's why DOI itself referred to these as "positions" to "be eliminated." Appx2745. For the same reasons, this meets the definition of a "reorganization," as the "functions or duties" performed by the fired employees were being "eliminat[ed]" or "redistribut[ed]." 5 C.F.R. § 351.203. The agencies had no

expectation that they would hire new employees to perform those jobs or continue performing the functions or duties associated with them—indeed, they had just deemed them to be unnecessary. Appx1244-1245, Appx2715-16.

Despite this, at times the administrative judge seemed to suggest that positions had not been "abolished." Appx14. The administrative judge didn't specify what "abolishing" the positions would have meant, and this can't be squared with her own recognition that the actions here were "taken with the goal of shrinking [the] workforce." Appx15, Appx41. The workforce couldn't shrink if the position were going to be refilled. The same problem infects the administrative judge's holding that there were no RIFs because, even if positions had been abolished, that happened after the firings. Appx14, Appx43. The decision to shrink the workforce by eliminating jobs deemed unnecessary preceded the terminations, and therefore was the start of the process. *See supra* 8-10.

## B. Failing to follow RIF procedures does not render a RIF unreviewable.

The administrative judge also held that DHS and DOI had not conducted RIFs because they did not follow the RIF regulations and engaged in mass firings to reduce the workforce without a formal "reorganization plan." Appx10, Appx43. This, too, was incorrect. The idea that an agency can avoid review of whether it followed the RIF requirements simply by not complying with those requirements is not only circular, it would undermine the protections and preferences required by Congress

when an agency undertakes a reduction in its workforce. *See, e.g.*, *Robinson*, 63 M.S.P.R. at 324 (rejecting agency attempt to evade RIF regulations); *see also Carter v. Small Bus. Admin.*, 23 M.S.P.R. 309, 313 (1984) (same under earlier version of RIF regulations); *Cramton v. Dep't of Treasury*, 27 M.S.P.R. 558, 559-61 (1985) (same).

The administrative judge began with the fact that a reorganization—one kind of RIF—is defined as "the *planned* elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203 (emphasis added). And, according to the administrative judge, for an action to be "planned," an agency must "follow" the RIF regulations' "complex process for deciding how to allocate its employees and which ones will be released after it has first determined it has employees excess to its needs." Appx40. Because the agencies did not follow these regulations, the judge concluded, they must not have conducted a RIF. This reasoning fails at multiple steps.

**1.** To begin, the RIFs *were* planned under the "plain meaning" of the term. *Barry*, 101 F.4th at 1352. When the regulations were promulgated, to "plan" meant broadly "to devise or project the realization of," "to arrange the parts of," "to set down the features of in a plan," "to devise procedures or regulations for in accordance with a comprehensive plan for achieving a given objective," and "to have in mind" or "intend." *Plan*, Webster's Third New International Dictionary of the English Language, 1730 (3d ed. 1961); *see also Plan*, American Heritage Dictionary (1st

ed. 1969) ("[t]o formulate a scheme or program for the accomplishment or attainment of," "[t]o have as a specific aim or purpose"); *Plan, Black's Law Dictionary*, 1309 (4th ed. 1968) (relevantly, "[a] delineation; a design; … a scheme; … also a method of action, procedure, or arrangement"). An action is planned when it is aimed for or intended or schemed out—a formal, detailed written plan for each contingency could be involved, but it is not required. *See, e.g.*, *Holmes*, 41 M.S.P.R. at 614-15. And here, the record clearly bears out that DHS and DOI "planned" to eliminate a large portion of the workforce based on specific directives from OPM setting out a process for doing so. *See supra* 8-13.

Indeed, the decision-making process as described by the administrative judge meets the ordinary definition of "planned": "[DOI], in accordance with OPM's guidance and the policy of the incoming administration, was taking steps to shrink the size of its workforce," and "its actions" to do so "began with identifying untenured staff serving a probationary period" for firing—subject to exceptions for "mission critical" employees who "performed functions related to immigration, national security, or public safety." Appx40-41; *see also* Appx4-5, Appx9-10. If that's not a "plan," it's hard to know what would be. And even DOI itself identified "workforce planning" as a justification for the terminations. Appx33.

Similarly, this Court and the Board ask whether the agency planned to eliminate functions and duties, not whether it created a formal "reorganization

plan." In *Bacon*, for example, this Court held that an attempt to address overstaffing "by eliminating positions in certain central offices" "clearly falls within the term 'reorganization,'" despite the agency's effort to "avoid[] use of the term 'reorganization.'" 757 F.2d at 269; *see also Losure v. ICC*, 2 M.S.P.B. 361, 364-65 (1980) (a "reorganization only on paper" is not what mattered, but whether there had been in a change in "substance."). That's because the planned elimination (or redistribution) of functions and duties is a reorganization, regardless of whether that plan is formally memorialized in a document labeled as a reorganization plan. *See, e.g.*, *O'Connell v. Dep't of Health & Human Servs.*, 21 M.S.P.R. 257, 260 (1984); *Griffin v. Dep't of Agric.*, 2 M.S.P.B. 335, 336-37 (1980).[5]

**2.** The administrative judge's contrary conclusion fails even on its own terms and misreads the regulations and statutes.

As an initial matter, the administrative judge read the "plan[]" language and surrounding regulatory context to mean that an agency must follow RIF procedures only "*after* it has first determined it has employees excess to its needs." Appx40. But

---

[5] To be clear, just because these actions were reductions in force does not mean that they were *lawful* reductions in force. For example, agencies bear the burden of demonstrating that a "RIF was taken for a bona fide management purpose[]," a question assessed by the MSPB after it accepts jurisdiction over a RIF appeal. *See, e.g., Brittain v. Dep't of Army*, 11 M.S.P.R. 287, 288 (1982); *see also New York v. Kennedy*, 789 F. Supp. 3d 174, 205 (D.R.I. 2025), *aff'd State v. Kennedy*, 155 F.4th 67 (1st Cir. 2025) (enjoining a RIF based on a purported reorganization as arbitrary and capricious).

even on the administrative judge's account, that's what happened here: The administration and OPM's determination that there were too many employees came *before* the terminations. *See supra* 8-14. So even under the administrative judge's own reading, the actions here were "planned."

Even putting that aside, the administrative judge's decision misread the requirements of 5 C.F.R. § 351.201(a)(2), which states that agencies must follow RIF rules for terminations due to:

> lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position [due] to erosion of duties when such action will take effect after an agency has formally announced a [RIF] in the employee's competitive area and when the [RIF] will take effect within 180 days.

According to the administrative judge, the clause at the end of this paragraph means that an action is only a reorganization "when such action will take effect after an agency has formally announced a [RIF] in the employee's competitive area and when the [RIF] will take effect within 180 days." Appx40. But the structure and punctuation of the paragraph make clear that this clause only applies to "reclassification of an employee's position [due] to erosion of duties," not to a "reorganization." 5 C.F.R. § 351.201(a)(2); *see also Cook v. Dep't of Interior*, 74 M.S.P.R. 454, 462 (1997) ("The formal announcement and 180-day provisions of 5 C.F.R. § 351.201(a)(2) apply only to RIFs that are based on a reclassification of an employee's

position due to an erosion of duties."), *aff'd sub nom. Shank v. Dep't of Interior*, 132 F.3d 50 (Fed. Cir. 1997).

Even if this qualifier did apply to reorganization, however, the result would be the same. An agency cannot evade RIF requirements on the grounds that it did not announce that it was undertaking a RIF. The idea that, because an agency "did not comply with the RIF requirements in terminating large numbers of probationary employees, the terminations were not RIFs at all" gets things exactly "backwards." *Maryland v. U.S. Dep't of Agric.*, 777 F. Supp. 3d 432, 472-73 ("*Maryland II*") (D. Md. 2025), *vacated on other grounds*, 151 F.4th 197 (4th Cir. 2025). "To reach the opposite conclusion—to say that the Government can choose to conduct RIFs without following RIF procedures so long as it does not call its actions RIFs—would be to utterly frustrate the manifest intent of Congress that the Government conduct mass layoffs in a planned and rational manner." *Id.*

Courts will "not adopt a construction that would have the effect of vitiating the statute altogether when, as here, the text does not compel such a result." *Id.* (citing Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012); *King v. Burwell*, 576 U.S. 473, 498 (2015)). Even the administrative judge recognized that "[a]gencies may not circumvent RIF regulations in effecting the types of organizational change covered by the regulations." Appx37. Yet the rule the administrative judge adopted would permit precisely that.

**3.** In an argument that the administrative judge credited in the DHS opinion but abandoned by the DOI opinion, she appeared to conclude that the word "planned" in the RIF regulations incorporates a separate statute setting out criteria for certain reorganization plans that would be "submitted to Congress prior to any action." Appx10 (citing 5 U.S.C. § 903). But that statute only governed reorganization plans "transmitted to Congress (in accordance with section 903(b)) on or before December 31, 1984." 5 U.S.C. § 905(b). And there's also no basis for concluding that the word "planned" in the regulation somehow incorporates these expired requirements, as the regulatory definition doesn't reference or cite the statute, even though versions of the statute predated the regulations. *See* 33 Fed. Reg. 12429 (Sept. 4, 1968); Pub. L. No. 89-554 § 903, 80 Stat. 394 (Sept. 6, 1966).

And once again, this argument suffers from the more fundamental flaw that an agency could evade the RIF rules by just not presenting a formal reorganization plan to Congress. That cannot be squared with the principle that it is the "essential nature of the action" and not the agency's "characterization of an action" that determines the applicable legal authority and requirements. *Baker*, 99 M.S.P.R. at 95; *see supra* 28-29. And it would again create a giant loophole, as an agency could eliminate any number of positions without complying with any of the reduction-in-

46

force regulations—so long as it didn't tell Congress what it was doing.[6]

**4.** Finally, the administrative judge stated that these actions were not a reorganization because the goal of "shrinking the size of the federal workforce" was somehow too "broad" an "objective." Appx10, Appx41. But the regulations contain no "too broad to regulate" exception to reorganizations that meet the regulatory definition. If reducing the workforce at a few offices based on overstaffing is a reorganization, *Bacon*, 757 F.2d at 269, it's hard to see how an even *larger* reduction in force based on (perceived) overstaffing would not qualify. The agencies, at the direction of OPM, rushed to eliminate thousands of positions across the agencies that they deemed non-critical. *See supra* 8-14. That's still a reorganization—i.e., the planned elimination (or redistribution) of functions and duties. Nor is there any plausible reason that Congress would have no longer cared about retention preferences for groups like veterans when reductions in the workforce were especially broad. If anything, those kinds of sweeping, structural actions would be the ones where such requirements would be especially important.

Accordingly, the agencies' failure to follow RIF rules or develop a formal, detailed "reorganization plan" did not allow them to circumvent the rules—much less make their actions unreviewable.

---

[6] The same goes for the administrative judge's citation to DHS-specific requirements of congressional approval prior to a reorganization. Appx10. (citing 6 U.S.C. § 452).

## C. Terminations via RIF are reviewable even when probationary employees are involved.

Lastly, the administrative judge concluded that the agencies' actions here were unreviewable because terminations of probationary employees for cause are ordinarily not reviewable. Appx13-14, Appx38. But appeals of terminations by RIF are expressly governed by a different regulation, under which probationary employees can appeal to the Board just like any other employee.

**1.** It is true that, subject to certain exceptions, probationary employees generally are limited in their ability to seek Board review of adverse employment decisions. The administrative judge, Appx39, cited a regulation that limits probationary employees' ability to seek Board review of adverse employment actions under "§ 315.804 or § 315.805." 5 C.F.R. § 315.806. Those two provisions cover "[t]ermination of probationers for unsatisfactory performance or conduct," *id.* § 315.804, and "[t]ermination of probationers for conditions arising before appointment," *id.* § 315.805.

However, there's no dispute that, under the plain text of the RIF regulations and Board precedent, probationary employees *may* appeal releases due to reductions in force. *See* 5 C.F.R. § 351.901; *see also supra* 7-8. The administrative judge agreed. Appx37. The straightforward takeaway is that if an agency terminates a probationary employee through a RIF, that employee can appeal—notwithstanding the otherwise limited appeal rights for probationary employees fired on other grounds. Nothing in

the regulations limiting review of for-cause adverse actions purports to exempt probationary employees from the plain text of the regulation expressly granting the right to appeal terminations due to RIFs. *See generally Holley v. United States*, 124 F.3d 1462, 1468 (Fed. Cir. 1997) (provisions of a unified scheme should be read in harmony, leaving no provision inoperative or superfluous or redundant or contradictory). Nor would this be consistent with Board precedent. *See supra* 7-8.

Not only that, but the terminations here don't even plausibly fall within the reasons for for-cause termination: Even the administrative judge noted that it was "undisputed that the class members were terminated … irrespective of their performance and conduct," Appx37, and the agencies never claimed the terminations were based on "conditions arising before appointment," 5 C.F.R. § 315.805.

**2.** There is no support in text or precedent for the administrative judge's decision to disregard the regulations providing for appeals of RIF terminations.

As an initial matter, the administrative judge at times appeared to conclude that she could not look behind the authority the agencies invoked for the terminations. Appx38-39. But that is once again directly contrary to the principle that substance, not the agency's labels, governs. *See, e.g., Baker*, 99 M.S.P.R. at 95; *James*, 284 F.3d at 1313-15. And in any event, the proffered reason here *was* workforce reduction—which is a classic RIF, not an individual adverse action. *See supra* 8-10.

Beyond that, the administrative judge reasoned that agencies have authority to fire probationary employees for "fitness," that "fitness" includes firing to reduce the size of the workforce, and that firings for lack of "fitness" are unreviewable. Appx13-14, Appx39. This cannot be squared with the regulatory text.

*First*, as a matter of "ordinary or natural meaning," *Tippins*, 93 F.4th at 1374-75, the word "fitness" means an assessment of the employee, and the employee's relationship to the position they hold—not of the position itself. In the employment context, "fitness" means "the condition of being qualified and suitable" such as "the candidate's fitness in education and morals." *Fitness*, Webster's Third New International Dictionary of the English Language, 860 (3d ed. 1961); *see also Fit*, Random House Dictionary of the English Language, 499 (1st ed. 1968) (defining "fit" in the context of employment as "qualified or competent, as for an office or function: a fit candidate"). That ties the considerations to the qualifications and characteristics of the employee, who is the one being judged for fitness. But a top-down decision to shrink the size of workforce—and thus to eliminate a certain job—is not about the qualification and suitability of the employee for that job. It's just about the job.

*Second*, the regulatory context confirms that "fitness" refers to an individual employee's conduct and qualifications—not mass workforce reductions. Agencies are to "utilize the probationary period as fully as possible to determine *the fitness* of the employee and shall terminate his or her services during this period if the

employee fails to demonstrate fully *his or her qualifications*." 5 C.F.R. § 315.803(a) (emphases added). And "[w]hen an agency decides to terminate an employee serving a probationary or trial period because his work *performance or conduct* during this period *fails to demonstrate his fitness* or his qualifications for continued employment," it must provide "notice as to why the employee is being terminated" that "consist[s] of the agency's conclusions as to the inadequacies of his performance or conduct." *Id.* § 315.804(a) (emphases added). Both regulations clearly tie the concept of fitness to an individual employee's performance and qualifications—which matches the ordinary meaning of the term. *See Maryland II*, 777 F. Supp. 3d at 467.

*Third*, these regulations have long been understood by courts as enabling the assessment of employees' performance and conduct. Congress's goal in creating the probationary period was to serve as "an extension of the examining process to determine an employee's ability to actually perform the duties of the position" before civil-service protections attach. *United States v. Connolly*, 716 F.2d 882, 886 (Fed. Cir. 1983). Allowing unreviewable "summary terminations" during this period "for unacceptable work performance or conduct" was designed to "assure[] management that it alone can assess an individual's skills and determine whether those skills satisfy the requirements of the service." *U.S. Dep't of Just. v. FLRA*, 709 F.2d 724, 729-30 (D.C. Cir. 1983). But the employer "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job."

*McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019). Even DHS's Chief Human Capital Officer acknowledged that agencies have "historically reviewed" probationers' "performance" "at the individual" level during the probationary period—he had never "come across a circumstance in which employees were not analyzed individually to figure out whether they [met] their probationary period standards." Appx1612.

Finally, if termination from a mere desire to reduce headcount or eliminate a position constitutes a nonreviewable termination for lack of "fitness," then agencies could simply evade RIF rules for probationary employees and disregard the protections and preferences imposed by such regulations and demanded by Congress. This kind of result is no more plausible or consistent with the regulatory framework than it is elsewhere.[7]

In sum, the employees' status as probationary did not exempt them from the regulation providing for review of terminations by RIF.

---

[7] The administrative judge may have thought that agencies have additional power to fire probationary employees besides that enumerated in the regulations, but even if that were true—which there is reason to doubt, *see Maryland II,* 777 F. Supp. 3d at 467, 448 n.12—this supposed power would not change the fact that *these* firings were caused by a RIF. And the plain text of the regulation grants the right to appeal terminations by RIF.

### III. These large-scale restructurings of federal agencies created by Congress violate the separation of powers.

Because these mass reductions in the agencies' workforces were reductions in force, the MSPB had jurisdiction, which is sufficient to warrant reversal. If this Court were to conclude otherwise, however, reversal is warranted because these attempts to conduct a large-scale restructuring of agencies created by Congress violated the separation of powers. While the administrative judge did not address the employees' constitutional challenge, this Court has jurisdiction over constitutional challenges even when the MSPB did not address them. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 17 (2012); *Briggs v. MSPB*, 331 F.3d 1307, 1312-13 (Fed. Cir. 2003).

**A.** Article I of the Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. And Congress "under its legislative power is given the establishment of offices, [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Accordingly, "[a]dministrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). "Congress has plenary control over the … duties[] and even existence of executive offices." *Free Enter. Fund*, 561 U.S. at 500. This remains Congress's prerogative unless it has otherwise authorized; after all, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374. This division of the legislative power to shape and executive power to operate forms key "checks and balances [that

are] the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986).

This is confirmed by "long settled and established practice," under which the large-scale restructuring of agencies is Congress's prerogative that the executive branch may exercise only when authorized by Congress. *Noel Canning*, 573 U.S. at 524. For decades, when Congress wanted to permit the restructuring of agencies, it passed statutes known as Reorganization Acts, which were limited authorizations. *See, e.g.*, Act of June 30, 1932, Pub. L. No. 72-212, §§ 403, 407, 47 Stat. 382, 413-15; Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, §§ 403, 407, 409, 47 Stat. 1489, 1517-19; Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561; Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613; Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203; Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29.

The most recent such law dates from 1984. *See* Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192, *codified at* 5 U.S.C. § 901(a). Under this statute, if the President determines that "changes in the organization of agencies are necessary" to, among other things, "reduce expenditures" and "increase the efficiency of the operations of the Government," then the President must "prepare a reorganization plan" specifying those reorganizations and transmit it to Congress. 5 U.S.C. §§ 901(a)(2)-3), 903(a)(1). Such a plan would "provide for" changes like "the abolition of all or a part of the functions of an agency." *Id.* § 903(a)(2). The

reorganization authority under that law required congressional approval of the reorganization. *Id*. §§ 906(a), 909. This authorization expired at the end of 1984 and Congress has not seen fit to renew it. *See id.* § 905(b). And while DHS's originating statute contains a separate reorganization authorization, it contains both procedures and limitations that were not followed here. *See* 6 U.S.C. § 452.

Indeed, in 2018, President Trump unsuccessfully sought the authority undertake the kind of restructuring that was attempted here. *See* Executive Office of the President of the United States, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* (June 21, 2018), https://perma.cc/9E78-FNTK. Two bills to that effect were introduced, neither of which passed. H.R. 6787, 115th Cong. (2017-2018); S. 3137, 115th Cong. (2018). There was a similar unsuccessful attempt earlier in 2025. *See* H.R. 1295, 119th Cong. (2025-2026). These unsuccessful attempts to request congressional authorization to restructure agencies further confirms the absence of unilateral executive power to do so. *See Biden v. Nebraska*, 600 U.S. 477, 504 (2023); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 586 (1952) (noting congressional refusal to authorize a claimed executive power).

**B.** The mass terminations here were part of a vast effort by the executive branch to exercise exactly the kind of authority to restructure agencies that the Constitution entrusted to Congress and which Congress has deliberately chosen not to delegate. From the outset, the incoming administration touted that it was

undertaking "a critical transformation of the Federal bureaucracy." Exec. Order. No. 14210, § 1. As OPM announced, the mass firings and eliminations of the purportedly non-essential functions were part of the "President's broader efforts to restructure and streamline the federal government." Appx2671 (quoting Tami Luhby, et al., CNN, *Thousands of probationary employees fired as Trump administration directs agencies to carry out widespread layoffs* (Feb. 14, 2025), https://perma.cc/RXV8-JNGX).

That is precisely the kind of restructuring that has long required congressional authorization. This restructuring through mass terminations was carried out through agencies that had "no power to act … unless and until Congress confers power upon [them]," *La. Pub. Serv. Comm'n*, 476 U.S. at 374, and required a power that Congress has withheld for nearly half a century. These executive actions, seeking to arrogate powers the Constitution granted to the legislative branch without any statutory authorization from Congress, violate the separation of powers. *See, e.g.*, *Youngstown*, 343 U.S. at 588-89.

In sum, while this Court need not reach this constitutional question if it determines that the administrative judge erred in holding that these actions were not RIFs, these attempts to undertake a large-scale restructuring of congressionally created agencies through mass terminations also violated the separation of powers.

## CONCLUSION

The decisions below should be reversed.

Respectfully submitted,

*/s/ Jennifer D. Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street
Suite 625
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
1400 16th Street, NW
Suite 225
Washington, DC 20036
(202) 888-1741

JOSEPH SELLERS
BRIAN C. CORMAN
REBECCA A. OJSERKIS
COHEN MILSTEIN SELLERS & TOLL
LLP
1100 New York Avenue, NW
Suite 800
Washington, DC 20005
(202) 408-4600

EVE L. HILL
ANISHA S. QUEEN
BROWN, GOLDSTEIN & LEVY LLP
120 E. Baltimore Street
Suite 2500
Baltimore, MD 21202
(410) 962-1030

GARY M. GILBERT
KEVIN OWEN
SHANNON C. LEARY

CHRISTOPHER H. BONK
GILBERT EMPLOYMENT LAW, PC
8403 Colesville Road
Suite 1000
Silver Spring, MD 20910
(301) 608-0880

ALICE HWANG
DANIEL M. ROSENTHAL
CHARLOTTE SCHWARTZ
EMILY R. POSTMAN
JAMES & HOFFMAN, PC
1629 K Street, NW
Suite 1050
Washington, DC 20006
(202) 496-0500

July 7, 2026                    *Counsel for Petitioners*

# Addendum

Initial decision in *DHS Probationary Employees 1 Class
v. Department of Homeland Security* (09/26/2025)......................................................... Appx1

Initial decision in *Interior Probationary Employees Class
v. Department of the Interior* (03/31/2026) ............................................................Appx29

| | |
|---|---|
| DHS PROBATIONARY EMPLOYEES 1 CLASS,<br><br>　　　　　Appellant,<br><br>　　　v.<br><br>DEPARTMENT OF HOMELAND SECURITY,<br><br>　　　　　Agency,<br><br>　　　and<br><br>DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT,<br>　　　　　Intervenor. | DOCKET NUMBER<br>DC-0752-25-1781-I-1<br><br><br>DATE: September 26, 2025 |

Christopher Hugh Bonk, Esquire, Shannon C. Leary, Esquire, Kevin L. Owen, Esquire, Anisha Queen, Esquire, Baltimore, Maryland, Daniel M. Rosenthal, Esquire, Alice C. Hwang, Esquire, Charlotte Hannah Schwartz, Esquire, Emily Postman, Esquire, Sejal Singh, Esquire, Joseph M. Sellers, Esquire, Rebecca Ojserkis, Esquire, Brian Corman, Esquire, Alisa Tiwari, Esquire, Washington, D.C., for the appellant.

John T. Koerner, Esquire, Washington, D.C., Tae L. Kim, Esquire, Arlington, Virginia, Karen Barefield, Esquire, Washington, D.C., Arnulfo Urias, Esquire, Los Angeles, California, Michelle Perry, Esquire, Washington, D.C., Margaret Slowen, Esquire, Linda M Aragon, Esquire, James Reed, Esquire, Essex Junction, Vermont, for the agency.

**BEFORE**
Sara K. Snyder
Chief Administrative Judge

**INITIAL DECISION**

**INTRODUCTION**

On March 5, 2025, appellant timely filed this appeal on behalf of a putative class of probationary or trial period employees the agency separated between

**Appx1**

February 14 and March 1, 2025, without using the reduction-in-force ("RIF") procedures of 5 C.F.R. part 351. Initial Appeal File (IAF), Tab 1. I granted the appellant's request for class certification on May 23, 2025, and amended the class definition at the request of the parties on June 23, 2025. IAF, Tabs 22, 34. The parties dispute the Board's jurisdiction. *See, e.g.*, IAF, Tab 27. The parties engaged in jurisdictional discovery and submitted evidence and argument on the issue of jurisdiction. IAF, Tab 34. The appellant did not request a hearing and the record on jurisdiction closed on August 22, 2025. IAF, Tabs 27, 34.

For the reasons discussed below, the appeal is DISMISSED for lack of jurisdiction.

## ANALYSIS AND FINDINGS

Burdens of Proof on Jurisdiction

The Board's jurisdiction is limited to matters specified by statute or regulation. *Garcia v. Department of Homeland Security*, 437 F.3d 1322, 1327 (Fed. Cir. 2006) (en banc). The Board does not have jurisdiction over all matters that are alleged to be unfair or incorrect. *See Miller v. Department of Homeland Security*, 111 M.S.P.R. 325, 332-33 (2009), *aff'd*, 361 F. App'x 134 (Fed. Cir. 2010). The appellant bears the burden of proving by preponderant evidence that the matter they are appealing is within the Board's authority to review. *Garcia*, 437 F.3d 1322, 1344; 5 C.F.R. § 1201.56(b)(2)(1)(A).

If the Board's jurisdiction is in dispute, as it is here, there is a two-step process wherein an appellant must first make a nonfrivolous allegation that the Board has jurisdiction over an appeal; if they do so, the appellant is entitled to a hearing on the jurisdictional question. *Garcia,* 437 F.3d at 1344; *Wilke v. Department of Homeland Security*, 104 M.S.P.R. 662, ¶ 10 (2007). Nonfrivolous allegations of Board jurisdiction are allegations of fact which, if proven, could establish a prima facie case that the Board has jurisdiction over the matter at issue. *Id*.; *see also* 5 C.F.R. § 1201.4(s) (defining "nonfrivolous allegation"). An allegation generally will be considered nonfrivolous when, under oath or penalty of perjury, an individual makes an allegation that: (1) is more than

conclusory; (2) is plausible on its face; and (3) is material to the legal issues in the appeal. 5 C.F.R. § 1201.4(s).

When analyzing nonfrivolous allegations in the context of evaluating jurisdiction, the Board may consider the agency's unrebutted documentary evidence but may not weigh and resolve conflicting evidence. *Baldwin v. Department of Veterans Affairs*, 109 M.S.P.R. 392, ¶ 11 (2008); *Ferndon v. U.S. Postal Service*, 60 M.S.P.R. 325, 329 (1994). The Federal Circuit has held that the Board cannot consider an agency's interpretation of the evidence as if the Board were deciding a summary judgment motion; rather, the Board must evaluate the appellant's allegations on their face, which is akin to deciding a motion to dismiss. *See Hessami v. Merit Systems Protection Board*, 979 F.3d 1362, 1368-69 (Fed. Cir. 2020) (deciding individual right of action appeal under whistleblower protection laws); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (internal citation omitted).

If the appellant carries that burden, they are entitled to a hearing at which they bear the burden of proving the Board's jurisdiction by preponderant evidence. *See* 5 C.F.R. § 1201.56(b)(2)(i)(A). Preponderant evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. *Id*. at § 1201.4(q). Here, the appellant waived the right to a hearing on jurisdiction. IAF, Tab 27. As such, this decision is based on the written record as a whole and resolves the ultimate question of whether the appellant has proved the Board's jurisdiction by preponderant evidence.

Background

The background facts are undisputed unless specifically noted. On January 20, 2025, Inauguration Day, the incoming president issued a memorandum

imposing a hiring freeze on the Federal Government.[1] The memorandum exempted military personnel, positions related to immigration enforcement, national security and public safety, and authorized the U.S. Office of Personnel Management (OPM) to make further exemptions. *Id.* The stated purpose of the freeze was to "reduce the size of the Federal Government's workforce through efficiency improvements and attrition." *Id.* That same day, OPM issued a Memorandum to all heads and acting heads of departments and agencies entitled "Guidance on Probationary Periods, Administrative Leave and Details." IAF, Tab 40 at 8-10. The memorandum explained that employees serving probationary and trial period appointments could be removed without triggering a Merit Systems Protection Board (MSPB) appeal. *Id.* OPM directed that no later than "January 24, 2025, agencies should identify all employees on probationary periods" and send a list of those employees to OPM. *Id.* The memorandum further directed agencies to determine whether those employees should be retained. *Id.*

The agency, through its various subagencies, complied. The Cybersecurity & Infrastructure Security Agency (CISA) submitted a list of employees, initially recommending that 42 of its total 392 probationary employees be terminated. IAF, Tab 40 at 30. Other Department of Homeland Security (DHS) components initially recommended terminating 225 of its nearly 16,000 probationary and trial period employees. IAF, Tab 40 at 38-40. On February 12, 2025, OPM emailed agency leadership directing them to partner with their Chief Human Capital Officers (CHCO) to separate the probationary and trial period employees identified for separation by the following day, February 13, 2025. IAF, Tab 40 at 35-37. The email provided a template termination letter. *Id.* The guidance stated that "high-performing employees in mission critical areas" have been exempted from separation, instructing by implication that all others, regardless of performance evaluations or other feedback, should be separated. *Id.*

---

[1] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/. On February 11, 2025, the incoming President issued Executive Order No. 14210 "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," *reprinted in* 90 Fed. Reg 9669 (Feb. 14, 2025). Agency heads were directed to promptly begin steps to conduct large scale RIFs.

On February 14, 2025, the agency's CHCO directed the agency managers to begin terminating the employees on its list, using the provided template. IAF, Tab 40 at 41-62. Between February 14 and February 20, 2025, the agency terminated over 300 individuals serving a probationary or trial period. IAF, Tab 40 at 14, 42-62. The template termination notice provided the individuals with notice of their right to appeal their separations to the MSPB pursuant to 5 C.F.R. § 315.806. IAF, Tab 40 at 43-44.

On March 21, 2025, class counsel filed appeals on behalf of three individuals who were serving a probationary or trial period with two of the agency's subcomponents, the Federal Emergency Management Agency (FEMA) and CISA, seeking certification of a class of all the probationary and trial period employees the agency terminated beginning in February 2025. IAF, Tab 1. OPM intervened on April 21, 2025. IAF, Tab 15. On May 23, 2025, after the parties agreed to class certification for the purposes of determining jurisdiction, I certified the appeal to proceed as a class, defined as follows:

> [A]ny agency employees serving in a probationary or trial period who were issued termination notices between February 14-20, 2025, pursuant to the February 14, 2025 instructions from DHS leadership.

> The class does *not* include any individual who was terminated at or around the same time based on specific, individual performance or conduct deficiencies.

> The class also does *not* include any individual who received a substantively identical termination notice but meets the 5 U.S.C. § 7511 definition of employee and is therefore entitled to appeal separately the merits of their termination to the Board.

> The class definition is amended to consist of any agency employees serving in a probationary or trial period who were issued termination notices between February 14 and March 1, 2025, pursuant to the February 14. 2025 instructions from DHS leadership.

IAF, Tabs 22, 34. The appellant notified all of the potential class members. IAF, Tabs 29-30. The Board identified numerous individual appeals filed by class members, notified those individual appellants of their right to opt out of the class, and dismissed the individual appeals of those who did not opt out as subsumed in

the class. IAF, Tabs 18, 27; *See, e.g. Jantz v. Department of Homeland Security*, MSPB Docket No. SF-315H-25-0401-I-1, Initial Decision (Jul. 1, 2025).

The parties engaged in discovery and timely submitted evidence and argument in support of their positions on jurisdiction on August 8, 2025. IAF, Tabs 34, 38-39. OPM filed a Motion to Dismiss on August 8, 2025. IAF, Tab 38. The agency and the appellant filed rebuttal submissions on August 22, 2025, and the record on jurisdiction closed on that date. IAF, Tabs 34, 41-42.

The Appellant Class Members Are Not Employees as Defined by 5 U.S.C. § 7511

Subject to some exceptions, the Board generally does not have jurisdiction to review the termination of individuals serving a probationary or trial period that are not "employees" as defined by 5 U.S.C. § 7511. *See Bryant v. Department of the Army*, 2022 MSPB 1, ¶ 8; *see also* 5 C.F.R. §§ 11.4(a), 210.101(b), 1201.3(a) (3).[2] The appellants do not assert that the Board has jurisdiction based on the limited regulatory appeal rights in 5 C.F.R. §§ 315.805-.806, and I have excluded from the class any individual who can nonfrivolously allege they are an "employee" with Board appeal rights as defined in 5 U.S.C. § 7511. IAF, Tabs 22-34.

Law Applicable to RIF Appeals

The appellants assert that the Board has jurisdiction over the agency's actions as a de facto or constructive RIF. IAF, Tab 37 at 5, Tab 39 at 20. A RIF is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions. *See Tippins v. United*

---

[2] On April 24, 2025, the President issued an Executive Order (EO) titled "Strengthening Probationary Periods in the Federal Service," promulgating part 11 of Title 5, Code of Federal Regulations (Probationary and Trial Periods (Rule XI)), https://www.ecfr.gov/current/title-5/part-11. By its terms, the EO superseded subpart H of part 315 of Title 5, Code of Federal Regulations (Probation on Initial Appointment to a Competitive Position), rendering it inoperative and without effect for actions taken on or after April 24, 2025. Subpart H, specifically 5 C.F.R. § 315.806, included limited appeal rights for the competitive service based on claims of marital status and partisan political discrimination, as well as the procedural protections applicable when a termination was based on pre-employment reasons. This EO does not apply to the terminations challenged here, which occurred prior to April 24, 2025, but I note it because the applicable regulations have been eliminated.

*States*, 93 F.4th 1370, 1375 (Fed. Cir. 2024) (citations omitted). A RIF is not an adverse action against a particular employee but is directed solely at a position within an agency. *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (citing *Huber v. Merit Systems Protection Board,* 793 F.2d 284, 286 (Fed. Cir. 1986)).

The Board's jurisdiction over RIF appeals is regulatory. *Kohfield v. Department of the Navy*, 75 M.S.P.R. 1, 4 (1997). The Board has RIF jurisdiction when an employee was furloughed for more than 30 days, separated, or demoted by a RIF action as defined in OPM's regulations. 5 C.F.R. § 351.901; *see Adams v. Department of Defense*, 96 M.S.P.R. 325, ¶ 9 (2004).

OPM's regulations require the agency to follow the RIF regulations when it releases a "competing employee from his or her competitive level when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties when such action will take effect after an agency has formally announced a [RIF] in the employee's competitive area and when the [RIF] will take effect within 180 days." 5 C.F.R. § 351.201(a)(2). The regulations make clear that the only persons who are subjected to a RIF action because of a reorganization are those who are released from their competitive level by separation, demotion, or by certain furloughs or reassignments requiring displacement. *Krizman v. Merit Systems Protection Board*, 77 F.3d 434, 438 (Fed. Cir. 1996) (citing 5 C.F.R. § 351.201(a)(2)); *see Grier v. Department of Health and Human Services*, 750 F.2d 944, 945-46 (Fed. Cir. 1984) ("RIFs are not aimed at removing particular individuals; rather, they are directed solely at positions. After the agency has decided to eliminate positions as a matter of its independent managerial discretion, the identification of affected employees is governed by OPM regulations"); *Huber,* 793 F.2d at 286; *Perlman v. Department of the Army*, 23 M.S.P.R. 125, 126 (1984) (Board had jurisdiction under RIF regulations where agency separated term employee after reclassifying position employee occupied).

*See also Tippins*, 93 F.4th at 1375 (discussing the definition of a RIF in the context of 14 U.S.C. § 357).

The Board has jurisdiction over appeals filed by probationary, term, and trial period employees who are separated by RIF. *See Bielomaz v. Department of the Navy*, 86 M.S.P.R. 276, ¶ 11 (2000). Agencies may not circumvent RIF regulations in effecting the types of organizational change covered by the regulations. *See Robinson v. U.S. Postal Service*, 63 M.S.P.R. 307, 324 (1994). The label the agency ascribes to its action is not dispositive. *Holmes v. Department of the Army*, 41 M.S.P.R. 612, 615 (1989) (holding agency's restructuring impacting a single position sufficient for agency to invoke RIF regulations); *see also Baker v. Department of Homeland Security*, 99 M.S.P.R. 92, ¶ 7 (2005) (where the agency's action was not "directed solely at a position within [the] agency," the removal was not a RIF action).

Analysis

The appellant alleges that the agency terminated the class members as part of a government-wide reorganization, as directed by OPM and in accordance with executive orders to reduce the size of the Federal workforce, to include "undertak[ing] preparations to initiate large-scale reductions in force (RIFs)." IAF, Tab 37 at 9-11. The appellant points to the repeated references to identifying probationary employees in "mission-critical" roles for exemption, as well as testimony from the agency's CHCO, for the proposition that the agency selected class members for termination based on the "mission critical" nature of the positions they occupied rather than individual performance and conduct. *Id.* The appellant also appears to argue that an individualized assessment of the performance and conduct is required by regulation to terminate a probationary employee. *Id.* at 14-17. The appellant points to record evidence that a Deputy CHCO, in an email with the subject "RIF Numbers," requested agency staff to provide updated counts of probationary terminations and exemptions. *Id.* at 26. In another email exchange, a different Deputy CHCO posited that the "billet" occupied by the separated class member "ultimately goes away." *Id.* at 94. The

appellant argues that the agency's action targeted positions for elimination, rather than employees, which means this was a RIF, the Board has jurisdiction and the class members are entitled to relief because the agency did not comply with the RIF regulations. IAF, Tab 37.

Turning to the first part of the argument, the appellant does not allege that the actions were taken for lack of work, shortage of funds, insufficient personnel ceiling or the exercise of reemployment rights or restoration rights. IAF, Tab 37 at 8-9, 103-104. There is no dispute that the agency did not submit a RIF plan or announce a RIF prior to terminating the class members. IAF, Tab 40 at 67-73. Instead, the appellant alleges that the termination of the class members was due to an agency reorganization, which requires it to comply with 5 C.F.R. part 351.

As discussed above, the January 20, 2025, "Hiring Freeze" memorandum directed OPM to issue guidance to agencies to develop a plan to "reduce the size of the Federal Government's workforce through efficiency improvements and attrition."[3] That same day, OPM directed agencies to identify individual employees, who, based on the type of appointment, could be removed without triggering MSPB appeal rights, and to determine if they should be retained or not. IAF, Tab 40 at 8. OPM's memorandum characterized the probationary period as a tool to "manage staffing levels." *Id.*

On February 11, 2025, the President issued another executive order establishing the Department of Government Efficiency, again with the stated intention of shrinking the Federal workforce.[4] On February 12, 2025, at a meeting with the CHCO Council, OPM clarified that agencies were to terminate probationary employees who did not perform "mission critical" functions at the agency by no later than February 13, 2025, a date that was later extended to February 17, 2025. IAF, Tab 40 at 35, 41. The appellant alleges that this context

---

[3] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

[4] The quoted phrase comes from a Fact Sheet about the February 11, 2025, Executive Order. https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-works-to-remake-americas-federal-workforce/. *See* Exec. Order No. 14210 (Feb. 11, 2025), *reprinted in* 90 Fed. Reg. 9669 (Feb. 14, 2025).

brings the agency's termination of its probationers under the umbrella of the overall reorganization discussed in executive orders and OPM memoranda.

"Shrink[ing] the size of the federal workforce," is a broad objective compared to the specific reasons for conducting a RIF as specified in 5 C.F.R. § 351.201(a)(2). Rather, a "reorganization" is specifically defined in statute and regulation. 5 C.F.R. § 351.203. A reorganization requires a *plan,* submitted to Congress prior to any action that will involve "abolishing all or part of the functions of an agency, consolidating or coordinating part of an agency or its functions with another part of the same agency, authorizing an officer to delegate any functions, or abolishing an agency or an agency component." *See* IAF, Tab 41 at 7 (citing 5 U.S.C. § 903). The agency's implementing statute requires Congressional approval for any reorganization. IAF, Tab 41 at 8. *See* 6 U.S.C. § 452. While the agency was ordered to submit a reorganization plan in compliance with later executive orders, it had taken none of these steps at the time it took the actions at issue here. IAF, Tab 41 at 7-8, 64-73. To be a reorganization justifying a RIF, the agency must change its organizational structure in such a way as to impact positions. *See Holmes,* 41 M.S.P.R. at 616. Simply contemplating a reorganization does not mean that a reorganization occurred. *See Shillinger v. Department of Labor,* 47 M.S.P.R. 145, 150 (1990).

The appellant submits that the agency internally referred to the class member terminations as a RIF, in that a Deputy CHRO used the term "RIF Numbers" in the subject line of an email thread about the probationary terminations. IAF, Tab 37 at 19, 26. The agency's human resources staff discussed the probationary terminations in the same email thread as voluntary early retirements (VERA), the deferred resignation program (DRP), and its elimination of its diversity, equity and inclusion (DEI) staff through a RIF. IAF, Tab 40 at 65-66. Finally, the agency's press secretary released a statement that the agency was in the process of sweeping cuts and reform which included the probationary terminations and "other wasteful positions and offices." IAF, Tab 37 at 13. The agency's CHCO testified at deposition that its human resources

staff were simply mistaken in referring to the probationary terminations as RIF numbers. IAF, Tab 40 at 27. The agency said that its press secretary's statement was "little more than puffery designed to create excitement." Tab 41 at 13. At deposition, the agency's CHCO testified that the probationary separations were part of its RIF avoidance measures, which also included the hiring freeze, the DRP, and the VERAs. IAF, Tab 40 at 16-18.

As discussed above, the Board has held that an agency's use of the term "RIF" is not dispositive. *See Holmes,* 41 M.S.P.R. at 616. RIFs after a reorganization unequivocally require a planned change to the organization that eliminates positions, not just its current occupant. *See Tippins*, 93 F.4th at 1370. The Board's statement in *Holmes* referred to the agency's attempt to use the RIF regulations as a pretext for removing the appellant; the Board was not evaluating whether the agency was required to apply the RIF regulations, only whether it was permitted to do so based on its characterization of its action as a RIF. *Id. Holmes* accepted the agency's assertion that it was reorganizing because it proved it made organizational changes that increased the duties and grade of the position the appellant had held, displacing him from it. 41 M.S.P.R. at 616.

The Board did find that the RIF procedures were mandatory in *Robinson*; however, the agency was admittedly restructuring. *Robinson*, 63 M.S.P.R. 307. In *Robinson*, the agency first consolidated work groups and then reassigned the appellants from redundant management positions with saved pay or grade, attempting to avoid the RIF procedures, which the Board found unlawful. *Id.* In *Losure*[5] and *Huber*, the Board and the Federal Circuit rejected the agency's attempt to characterize its actions in eliminating and replacing the appellants' positions as a RIF because there was *not* a planned change to the agency's structure. *See* 2 MSPB 361, 364; 793 F.2d 284, 286. In both cases, the agency's assertion that it acted pursuant to the RIF regulations was rejected because the employees proved they were selected for separation because of reasons personal to them – Losure's affiliation with disgraced managers and the *Huber* petitioner's

---

[5] *Losure v. Interstate Commerce Commission*, 2 MSPB 361.

Schedule A appointments. *Id.* In both cases, the agency made no significant changes to the duties or responsibilities of the positions the impacted employees held and replaced them after the sham reorganization was complete. *Id.* Finally, I note that while the situation in *Tippins* arose through the operation of a process that is only applicable to uniformed service members, the Federal Circuit found that the agency's actions in terminating retirement eligible military personnel in order to fill behind those employees with younger employees was not a "RIF," distinguishing the situation from a "reorganization" that would trigger a RIF under 5 CFR part 351 because the agency's actions started by targeting the characteristics of individual employees, specifically, the fact of their retirement eligibility. *Id.*

Read together, the binding precedent holds that a RIF occurs when an agency first eliminates jobs and then reassigns or separates the employees who held those jobs, not the other way around. *See Tippins*, 93 F.4th at 1375. Here, the agency action started with the character of the class member's appointment – probationary or trial period – exempting them only if the position they held was also "mission critical." The nature of the appointment they held is an individual characteristic of the employee, not the position they held. *See e.g. Tippins*, 93 F. 4th 1370; *Huber*, 793 F.2d 284.

The appellant argues that the agency's indiscriminate terminations of the class members, irrespective of their individual performance and conduct, means that the agency must be targeting positions, making this a RIF. IAF, Tab 37 at 13-17. This "one or the other" argument is not persuasive. Even when it removes or separates a tenured federal employee, a Federal agency has considerable discretion to choose among available authorities for its actions. *See, e.g. Lovshin v. Department of the Navy*, 767 F.2d 826, 840-43 (1985) (en banc) (holding that CSRA [Civil Service Reform Act] does not limit agency discretion to address unacceptable performance using removal procedures of chapter 43 or chapter 75). The agency argues that its ability to separate probationers is far broader than its

authority under chapters 43 or 75, and broader than the appellant suggests.[6] IAF, Tab 39 at 12-20, Tab 41 at 5-8.  The agency's position is in line with precedent finding that it has the authority and discretion under § 315.803(a) to exercise the "right to summary termination" of probationers for any reason related to fitness or qualification not otherwise prohibited by law.  *U.S. Department of Justice, I.N.S. v. Federal Labor Relations Authority*, 709 F.2d 724, 728 (D.C. Cir. 1983). The Federal Circuit described the "protections provided to probationary employees" as "very narrow[.]" *Lewis v. Fed. Bureau of Prisons*, 93 F.4th 1381, 1385 (Fed. Cir. 2024) (quoting *Shaw v. United States*, 622 F.2d 520, 527 (Ct. Cl. 1980)).  As reflected in OPM's published guidance and its messages to the CHCO Council, the agency and OPM take the position that it has authority to separate probationary employees for reasons other than performance and conduct, supporting that argument with the legislative history of the CSRA, the act itself, and an overall review of the regulations related to probationary employment. IAF, Tab 38 at 6-8, Tab 39 at 15-16.  Specifically, 5 C.F.R. § 315.803(a) refers to the "fitness" of the employee and that agencies "shall terminate" any employee that fails to demonstrate their qualifications for continued employment during the probationary period.  *Id.*  The agency argues that the concept of "fitness" is broad enough to include terminating probationary employees to manage staffing.  *Id.* The agency's arguments are consistent with the lack of Board review for such terminations.  Similarly, the prior version of the Federal Personnel Manual[7] and

---

[6] Even if the appellant is correct that probationary employees may only be terminated for performance or conduct, the Board does not have the authority to reach the merits of a probationary termination, and I make no findings about the stated reasons for the terminations at issue here. 5 U.S.C. §§ 4303(e)-(f), 7511(a), 7512, 7413(d). Some employees may appeal a probationary termination to the Board for illegal motivation, such as through the prior version of 5 C.F.R. § 315.806, the Whistleblower Protection Act (WPEA), and the Uniformed Service Employment and Reemployment Rights Act (USERRA). *See* 5 U.S.C. §§ 2302(a)(2)(A).  In such cases, the agency's rationale for the termination is relevant but not determinative. *See, e.g., Reese v. Department of the Navy*, 2025 MSPB 1, ¶¶ 61-64.  The class appellant has stipulated that none of these exceptions apply to the class member terminations.

[7] Federal Personnel Manual, chapter 351, at § 1-3 (1988).

OPM's Workforce Reshaping Handbook[8] both refer to separating employees without appeal rights as a typical RIF avoidance measure. That is how the agency's CHCO characterized the actions at issue here. IAF, Tab 40 at 17.

Finally, the appellant alleges that the end result of the agency's effort will be the abolishment of the positions held by the class members. IAF, Tab 37 at 17-19. The appellant points to emails from the Deputy CHCO stating as much. IAF, Tab 37 at 18, 94. The agency cannot fill behind the terminated employees because of the hiring freeze. *Id.* As both parties note, the *sine qua non* of a RIF is abolishing positions. Releasing employees because the position they hold is abolished *is* covered by 5 C.F.R. § 351.201(a)(2).

As I have already discussed, even if I accepted the appellant's allegations as true, separating over 300 employees who held probationary appointments does not reflect the sort of reasoned plan for changing the structure of the agency subcomponents from which the class members were terminated. There is little evidence that the agency had abolished or planned to abolish the specific positions the class members held before the agency terminated the class members. The agency maintains that it has not. IAF, Tab 40 at 20. The appellant points to a comment by the agency's Deputy Chief Human Capital Officer (DHCO) who opined that "the billet ultimately goes away" in response to a question about what would happen to the positions occupied by a probationary employee they terminate as evidence that the positions were abolished. IAF, Tab 37 at 15, 60-63. At deposition, the agency's CHCO explained that the comment was only related to employees who took the DRP, not the probationers. IAF, Tab 40 at 20-21. The CHCO further explained that there was no direct impact to the agency's budget or number of positions when it separated the probationers, although it gave the agency more flexibility to move resources in the future, if necessary. *Id.* at 20-21. However, even if the DHCO was correct, and the positions may eventually be repurposed or abolished, this would not support the appellant's argument. The

---

[8] U.S. Office of Pers. Mgmt., *Workforce Reshaping Handbook*, chapter 1, p. 9 (Mar. 2017), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

RIF process is triggered when an agency needs to do something with the employee that held an abolished position, not the other way around. *Tippins*, 93 F.4th at 1375.

<u>Conclusion</u>

This appeal presents a question of law, and there are no material disputes of fact. Whether or not the appellant made nonfrivolous allegations and would have been entitled to a hearing would have been a closer call, but as the hearing was waived, I conclude that the appellant has not proved by preponderant evidence that when the agency terminated over 300 probationary or trial period employees, who had no right to appeal the merits of the action to the Board, with the goal of shrinking its workforce, that it conducted a RIF and was required to comply with the procedures of 5 C.F.R. part 351. The employees were identified and terminated because of the nature of their appointments, not to abolish the positions they held. An eventual agency planned reorganization or restructuring is not relevant to the appellant's current appeal rights. Therefore, the appeal is DISMISSED for lack of jurisdiction.

**DECISION**

The appeal is DISMISSED.

*Sara K Snyder*

FOR THE BOARD: _____
          Sara K. Snyder
          Chief Administrative Judge

**NOTICE TO PARTIES CONCERNING SETTLEMENT**

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

**NOTICE TO APPELLANT**

This initial decision will become final on **<u>October 31, 2025</u>**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic

**Appx16**

filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

### Criteria for Granting a Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the

length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

## NOTICE OF LACK OF QUORUM

While administrative judges may continue to issue initial decisions like this one, the Board must have two or more members (known as a quorum) to issue decisions on petitions for review (PFR). *See* 5 U.S.C. § 1201; 5 C.F.R. § 1200.3(a), (e). Currently, the Board only has one member, so it is unable to issue any final Board decisions on PFRs. This means that while parties may still file PFRs on initial decisions during this time, no decisions on them will be issued until at least two members are in place, thereby restoring the Board's quorum. Importantly, the absence of a quorum does not extend any deadlines for filing a PFR. Anyone filing a PFR must still meet the deadline outlined above.

## NOTICE TO AGENCY/INTERVENOR

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review. Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully

follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)** **Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision becomes final</u> as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations

Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3)** **Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The

Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Service DHS Probationary Employees 1 Class
Served on email address registered with MSPB

Appellant Representative

Electronic Service Christopher Bonk
Served on email address registered with MSPB

Appellant Representative

Electronic Service Brian Corman
Served on email address registered with MSPB

Appellant Representative

Electronic Service Alice Hwang
Served on email address registered with MSPB

Appellant Representative

Electronic Service Shannon Leary
Served on email address registered with MSPB

**Appx24**

Appellant Representative

Electronic Service    Rebecca Ojserkis
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Kevin Owen
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Emily Postman
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Anisha Queen
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Daniel Rosenthal
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Charlotte Schwartz
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Joseph Sellers
Served on email address registered with MSPB

**Appx25**

Appellant Representative

Electronic Service    Sejal Singh
Served on email address registered with MSPB

Appellant Representative

Electronic Service    Alisa Tiwari
Served on email address registered with MSPB

Agency Representative

Electronic Service    Linda Aragon
Served on email address registered with MSPB

Agency Representative

Electronic Service    Karen Barefield
Served on email address registered with MSPB

Agency Representative

Electronic Service    Tae Kim
Served on email address registered with MSPB

Agency Representative

Electronic Service    John Koerner
Served on email address registered with MSPB

Agency Representative

Electronic Service    Michelle Perry
Served on email address registered with MSPB

**Appx26**

Agency Representative

Electronic Service James Reed
Served on email address registered with MSPB

Agency Representative

Electronic Service Margaret Slowen
Served on email address registered with MSPB

Agency Representative

Electronic Service Arnulfo Urias
Served on email address registered with MSPB

Statutory Intervenor

Electronic Service Patrick Ehler
Served on email address registered with MSPB

Statutory Intervenor

Electronic Service Eyana Esters
Served on email address registered with MSPB

Secondary Appellant

U.S. Mail Robert Horton
1540 Brentwood Drive
Eagle Point, Oregon 97524

Secondary Appellant

U.S. Mail Lilia Irizarry-Felix
5429 8th Rd. S
Arlington, Virginia 22204

**Appx27**

Secondary Appellant

Electronic Service      Jeffrey Smyly

Served on email address registered with MSPB

*Pamela Paragas*

<u>       09/26/2025       </u>        <u>                           </u>

       (Date)                       Pamela Paragas

                                        Paralegal Specialist

**Appx28**

| | |
|---|---|
| INTERIOR PROBATIONARY EMPLOYEES CLASS,<br>　　　　Appellant,<br><br>　　v.<br><br>DEPARTMENT OF THE INTERIOR,<br>　　　　Agency,<br><br>　　and<br><br>OFFICE OF PERSONNEL MANAGEMENT,<br>　　　　Intervenor. | DOCKET NUMBER<br>DC-0752-25-1550-I-1<br><br><br>DATE: March 31, 2026 |

Daniel M. Rosenthal, Esquire, Alice C. Hwang, Esquire, Anisha Queen, Esquire, Baltimore, Maryland, Charlotte Hannah Schwartz, Esquire, Emily Postman, Esquire, Joseph M. Sellers, Esquire, Rebecca Ojserkis, Esquire, Brian Corman, Esquire, Alisa Tiwari, Esquire, Washington, D.C., Shannon C. Leary, Esquire, Kevin L. Owen, Esquire, Christopher Hugh Bonk, Esquire, Silver Spring, Maryland, for the appellant.

Stacy Biney, Esquire, Maria Iliadis, Esquire, Rachel Wieghaus, Esquire, Washington, D.C., for the agency.


**BEFORE**
Sara K. Snyder
Chief Administrative Judge


**INITIAL DECISION**


**INTRODUCTION**

On March 3, 2025, appellant timely filed this appeal on behalf of a putative class of probationary or trial period employees the agency separated between

February 14 and February 18, 2025, without using the reduction in force ("RIF") procedures of 5 C.F.R. part 351. Initial Appeal File (IAF), Tabs 1, 39, 40. I granted the appellant's request for class certification on July 17, 2025. IAF, Tabs 35. The parties dispute the Board's jurisdiction. The parties engaged in jurisdictional discovery and submitted evidence and argument on the issue of jurisdiction. IAF, Tabs 55, 58, 63, 64. The record on jurisdiction closed on December 26, 2025.[1] *Id.*

For the reasons discussed below, the appeal is DISMISSED for lack of jurisdiction.

## ANALYSIS AND FINDINGS

Burdens of Proof on Jurisdiction

The Board's jurisdiction is limited to matters specified by statute or regulation. *Garcia v. Department of Homeland Security*, 437 F.3d 1322, 1327 (Fed. Cir. 2006) (en banc). The Board does not have jurisdiction over all matters that are alleged to be unfair or incorrect. *See Miller v. Department of Homeland Security*, 111 M.S.P.R. 325, 332-22 (2009). The appellant bears the burden of proving by preponderant evidence that the matter they are appealing is within the Board's authority to review. *Garcia*, 437 F.3d at 1344; 5 C.F.R. §1201.56(b)(2)(1)(A).

If the Board's jurisdiction is in dispute, as it is here, there is a two-step process wherein an appellant must first make a nonfrivolous allegation that the Board has jurisdiction over an appeal; if they do so, the appellant is entitled to a hearing on the jurisdictional question. *Garcia,* 437 F.3d at 1344; *Wilke v. Department of Homeland Security*, 104 M.S.P.R. 662, ¶ 10 (2007). Nonfrivolous allegations of Board jurisdiction are allegations of fact which, if

---

[1] December 26 was a Federal holiday in 2025. *See* Executive Order No. 14371, 90 FR 60545 (Dec. 23, 2025). Consequently, the last day for the parties to file a reply was December 29, 2025. *See* 5 C.F.R. § 1201.23.

proven, could establish a prima facie case that the Board has jurisdiction over the matter at issue. *Id*.; *see also* 5 C.F.R. § 1201.4(s) (defining "nonfrivolous allegation"). An allegation generally will be considered nonfrivolous when, under oath or penalty of perjury, an individual makes an allegation that: (1) is more than conclusory; (2) is plausible on its face; and (3) is material to the legal issues in the appeal. 5 C.F.R. § 1201.4(s).

When analyzing nonfrivolous allegations in the context of evaluating jurisdiction, the Board may consider the agency's unrebutted documentary evidence but may not weigh and resolve conflicting evidence. *Baldwin v. Department of Veterans Affairs*, 109 M.S.P.R. 392, ¶ 11 (2008); *Ferdon v. U.S. Postal Service*, 60 M.S.P.R. 325, 329 (1994). The Federal Circuit has held that the Board cannot consider an agency's interpretation of the evidence as if the Board were deciding a summary judgment motion; rather, the Board must evaluate the appellant's allegations on their face, which is akin to deciding a motion to dismiss. *See Hessami v. Merit Systems Protection Board*, 979 F.3d 1362, 1368-69 (Fed. Cir. 2020) (deciding individual right of action appeal under whistleblower protection laws); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.") (internal citation omitted).

If the appellant carries that burden, they are entitled to a hearing at which they bear the burden of proving the Board's jurisdiction by preponderant evidence. *See* 5 C.F.R. § 1201.56(b)(2)(i)(A). Preponderant evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. *Id*. at § 1201.4(q).

Background

The background facts are undisputed. On January 20, 2025, inauguration day, the incoming president issued a memorandum imposing a hiring freeze on the Federal Government.[2] The memorandum and contemporaneous U.S. Office of Personnel Management (OPM) guidance exempted political appointments, military personnel, positions related to immigration enforcement, national security and public safety, and authorized OPM to make further exemptions. *Id.*; IAF, Tab 56 at 41-42. The stated purpose of the freeze was to "reduce the size of the Federal Government's workforce through efficiency improvements and attrition." *Id.* at 44.

That same day, OPM issued a Memorandum to all heads and acting heads of departments and agencies entitled "Guidance on Probationary Periods, Administrative Leave, and Details." IAF, Tab 56 at 49, 61. The memorandum noted that employees serving probationary and trial period appointments could be removed without triggering an Merit Systems Protection Board appeal. *Id.* It further characterized the probationary period as a tool to "manage staffing levels." *Id.* OPM directed that no later than "January 24, 2025, agencies should identify all employees on probationary periods" and send a list of those employees to OPM. *Id.* The memorandum further directed agencies to determine whether those employees should be retained. *Id.* The agency complied, sending a list of over 4000 employees to OPM. IAF, Tab 56 at 55.

In follow-up correspondence with OPM and in meetings of the Chief Human Capital Officer (CHCO) council, OPM clarified that the agencies should only retain high performing employees in mission critical areas of immigration enforcement, national security, and public safety, and take action to separate the rest. IAF, Tab 56 at 70-113. OPM asserted that 5 C.F.R. § 315.803 requires agencies to utilize the probationary period as fully as possible to determine

---

[2]. https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

fitness of the employee, and that employees who do not demonstrate that their continued employment is in the public interest are not fit for continued employment. *Id.*

On February 12, 2025, OPM emailed agency leadership directing them to partner with their CHCO to separate the probationary and trial period employees identified for separation by the following day, February 13, 2025. IAF, Tab 56 at 70; IAF, Tab 58 at 115-116. OPM provided a template termination letter purporting to separate the employee based on performance or conduct deficiencies. Tab 58 at 109-115. Beginning on February 14, 2025, the Department of Interior terminated nearly two thousand[3] probationary employees. IAF, Tab 56 at 11; Tab 58 at 120. There is no dispute that the agency separated these employees because OPM directed it to do so. It exempted probationers that were deemed to be in jobs the agency determined to be related to national security and public safety, again in compliance with direction from OPM. IAF, Tab 56 at 89.

The agency does not appear to have consistently used OPM's template termination notice. IAF, Tab 56 at 20. Employees were advised they could be separated because of "workforce planning," and the termination notices in the record advised the employees that their "knowledge, skills and abilities do not meet the Department's current needs." *Id*. The agency provided notice of the employees' limited right to appeal their separations to MSPB pursuant to 5 C.F.R. § 315.806.[4]

---

[3] The specific number has fluctuated across agency submissions. *See, e.g.,* IAF, Tab 56 at 116, Tab 58 at 120.

[4] At the time, the Board's limited jurisdiction encompassed review of actions where the appellant makes a non-frivolous allegation that they were separated due to marital status or partisan political reasons. *See* 5 C.F.R. § 315.806 (2025) (removed by *Final Rule* 90 FR 26727, June 24, 2025). The Board never had an independent basis to review the accuracy of the agency's stated reason for a probationary termination.

On or about March 3, 2025, class counsel filed appeals on behalf of three individuals who were serving probationary periods with the U.S. Geological Survey, the National Park Service, and the U.S. Fish and Wildlife Service, which are subcomponents of the Department of the Interior, seeking certification of a class of all the probationary and trial period employees the agency terminated beginning February 14, 2025. IAF, Tab 1. Beginning in March 2025, in response to other litigation,[5] the agency began to reinstate the putative class members. IAF, Tab 23 at 73. OPM intervened on April 21, 2025. IAF, Tab 10. On July 17, 2025, after it became clear that the agency had not effected a complete rescission, I certified the appeal to proceed as a class, defined as follows:

> [A]ny agency employees serving in a probationary or trial period who were issued termination notices between February 14-18, 2025, in response to a January 20, 2025, guidance memorandum issued by the Office of Personnel Management.
>
> The class does *not* include any individual who was terminated at or around the same time based on specific, individual performance or conduct deficiencies.
>
> The class does *not* include any individual that can nonfrivolously allege they are an "employee" with Board appeal rights as defined in 5 U.S.C. § 7511.
>
> The class does *not* include any individual who signed an agreement with the agency to enroll in its deferred resignation program or any similar agreement waiving the right to pursue a Board appeal of their termination.

IAF, Tabs 35, 39, 40. The appellant notified the potential class members. IAF, Tabs 39-40. The Board identified numerous individual appeals filed by class members, consolidated those appeals, notified the appellants of their right to opt out of the class, and then dismissed the appeals of those who did not opt out as subsumed in the class. IAF, Tabs 35, 39, 40. *See, e.g. Interior Probationers*

---

[5] The appellant's jurisdiction brief cites to these lawsuits in its brief and attaches declarations from it. IAF, Tab 56. Those suits sought and in some cases received injunctive relief, but to my knowledge, turned on different issues of law and in any case, are not final decisions with preclusive effect on the Board's litigation. *See, e.g., MacLean v. Department of Homeland Security*, 2024 MSPB 15 ¶¶ 9, 13 (Nov. 14, 2024).

*Consolidation v. Department of the Interior*, MSPB Docket No. CF-315H-25-0034-I-1, Initial Decision (August 25, 2025).

The parties engaged in discovery[6] and submitted evidence and argument in support of their positions on jurisdiction.  IAF, Tabs 54, 56, 58, 63, 64.  The record closed on December 26, 2025.  IAF, Tab 54 at 3.

<u>The Appellant Class Members Are Not Employees as Defined by 5 U.S.C. § 7511</u>

Subject to some exceptions not relevant here, the Board generally does not have jurisdiction to review the termination of individuals serving a probationary or trial period that are not "employees" as defined by 5 U.S.C. § 7511. *See Bryant v. Department of the Army*, 2022 MSPB 1, ¶ 8; *see also* 5 C.F.R. §§ 11.4(a), 210.101(b), 1201.3(a)(3).[7]  I have excluded from the class any individual who can nonfrivolously allege they are an "employee" with Board appeal rights as defined in 5 U.S.C. § 7511.  IAF, Tab 35, 39, 40.  The agency argues that the actions at issue were taken under the authority of 5 C.F.R. § 315.803(a) and are only reviewable to the extent provided therein.

<u>The appellant class has not nonfrivolously alleged they were subjected to a RIF</u>

*Law Applicable to RIF Appeals*

The appellants assert that the Board has jurisdiction over the agency's actions as a de facto or constructive RIF, because the agency's actions were a reorganization covered by 5 C.F.R. part 351.  IAF, Tab 56 at 31; Tab 63 at 12.  A RIF is an administrative procedure by which agencies eliminate jobs and reassign

---

[6] The parties have an unresolved discovery dispute related to the application of the deliberative process privilege to records the appellant sought in discovery.  IAF Tab 65-66.  I make no further rulings on the dispute because the information sought pertains to an argument that is immaterial to the disposition of this appeal.

[7] On April 24, 2025, President Donald J. Trump issued an Executive Order (EO) titled "Strengthening Probationary Periods in the Federal Service," promulgating part 11 of Title 5, Code of Federal Regulations (Probationary and Trial Periods (Rule XI)). https://www.ecfr.gov/current/title-5/part-11.  OPM implemented the final rule June 24, 2025.  *See* 90 FR 26727.  The Board can only exercise its regulatory jurisdiction under subpart H of part 315 of Title 5 for actions that took place before April 24, 2025.

or separate employees who occupied the abolished positions. *See, e.g., Tippins v. United States*, 93 F.4ᵗʰ 1370, 1375 (Fed. Cir. 2024) (citations omitted). A RIF is not an adverse action against a particular employee but is directed solely at a position within an agency. *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (citing *Huber v. Merit Systems Protection Board,* 793 F.2d 284, 286 (Fed. Cir. 1986)).

The Board's jurisdiction over RIF appeals is regulatory. *Kohfield v. Department of the Navy*, 75 M.S.P.R. 1, 4 (1997). The Board has RIF jurisdiction when an employee was furloughed for more than 30 days, separated, or demoted by a RIF action as defined in OPM's regulations. 5 C.F.R. § 351.901; *see Adams v. Department of Defense*, 96 M.S.P.R. 325, ¶ 9 (2004).

OPM's regulations require the agency to follow the RIF regulations when it releases a "competing employee from his or her competitive level when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties when such action will take effect after an agency has formally announced a [RIF] in the employee's competitive area and when the [RIF] will take effect within 180 days." 5 C.F.R. § 351.201(a)(2). The regulations make clear that the only persons who are subjected to a RIF action because of a reorganization are those who are released from their competitive level by separation, demotion, or by certain furloughs or reassignments requiring displacement. *Krizman v. Merit Systems Protection Board*, 77 F.3d 434, 438 (Fed. Cir. 1996) (citing 5 C.F.R. § 351.201(a)(2)); *see Grier v. Department of Health and Human Services*, 750 F.2d 944, 945-46 (Fed. Cir. 1984) ("RIFs are not aimed at removing particular individuals; rather, they are directed solely at positions. After the agency has decided to eliminate positions as a matter of its independent managerial discretion, the identification of affected employees is governed by OPM regulations"); *Huber,* 793 F.2d at 286; *Perlman v. Department of the Army*,

23 M.S.P.R. 125, 126 (1984) (Board had jurisdiction under RIF regulations where agency separated term employee after reclassifying position employee occupied). *See also Tippins*, 93 F.4th at 1375 (discussing the definition of a RIF in the context of 14 U.S.C. § 357).

The Board has jurisdiction over appeals filed by probationary, term, and trial period employees who are separated by RIF. *See Bielomaz v. Department of the Navy*, 86 M.S.P.R. 276, ¶ 11 (2000). Agencies may not circumvent RIF regulations in effecting the types of organizational change covered by the regulations. *See Robinson v. U.S. Postal Service*, 63 M.S.P.R. 307 at 324 (1994). The label the agency ascribes to its action is not dispositive. *Holmes v. Department of the Army*, 41 M.S.P.R. 612, 615 (1989) (holding agency's restructuring impacting a single position sufficient for agency to invoke RIF regulations); *see also Baker v. Department of Homeland Security*, 99 M.S.P.R. 92, ¶ 7 (2005) (where the agency's action was not "directed solely at a position within [the] agency," the removal was not a RIF action).

*The appellant has not nonfrivolously alleged the class members were terminated because of an agency reorganization*

It is undisputed that the class members were terminated because they were probationary, irrespective of their performance and conduct, and that the agency chose to retain probationary employees who performed duties related to immigration enforcement, national security, or public safety, consistent with OPM's guidance. *See, e.g.,* IAF, Tab 58 at 121-129. To summarize the appellants' position, they argue that they have met their jurisdictional burden by alleging that the class members were terminated as part of an OPM-directed reorganization that sought to eliminate the duties and positions that were deemed unimportant or otherwise disfavored by the new administration. IAF, Tab 63 at 12. Because this was done without regard to the class members' performance or conduct, and with no plans to replace them or continue their work, the actions meet the regulatory definition of "reorganization" irrespective of any

reorganization plan or actions to formally abolish positions. IAF, Tab 56 at 23-24. The appellants argue that this is the type of organizational change that requires the agency to use the RIF regulations, and the agency's failure to do so requires reversal of the action. *Id.* 5 C.F.R. § 351.201.

First, the appellants' argument that the agency may only legitimately separate non-tenured employees for performance or conduct, or as part of a RIF, is not supported by this record or the law, and is not relevant to the issue presented. Even when it removes or separates a tenured Federal employee, a Federal agency has considerable discretion to choose among available authorities for its actions. *See, e.g. Lovshin v. Department of the Navy*, 767 F.2d 826, 840-43 (1985) (en banc) (holding that CSRA does not limit agency discretion to address unacceptable performance using removal procedures under either Chapter 43 or Chapter 75). In its 2008 commentary on updates to the suitability regulations, OPM cited *King v. Jerome*, 42 F.3d 1371, 1374 (Fed. Cir. 1994), for the principle that the Board must assess an agency action under the procedures elected by the agency and may not hold the agency to compliance with a legal authority the agency did not invoke. *See* 73 FR 20149-01, 2008 WL 1711239, *20152-3 (Apr. 15, 2008). While OPM's comment involved updating the suitability regulations conferring Board jurisdiction, OPM's discussion of the Board's inappropriate extension of the suitability regulations to adjudicate "constructive" suitability actions is comparable to the theory presented here by the appellants. While the appellants point to contrary comments in *Robinson* and *Holmes* for their constructive or de facto RIF theory, the alleged RIFs in *Robinson* and *Holmes* are factually distinguishable from the situation presented in this appeal.

Second, the appellant advances an expansive interpretation of the current regulatory framework for both probationary periods and the RIF process that is not supported by the text or binding precedent. The appellant argues, in essence, that the agency conducts a RIF whenever it removes a probationary employee for reasons other than individual performance and conduct. IAF, Tab 56 at 25. At the time of the actions at issue, 5 C.F.R. § 315.804 did refer to separations for

performance or conduct reasons. However, with narrow exceptions, the merits of an agency's separation of a probationary employee was unreviewable by the Board. *See* 5 C.F.R. § 315.806. Thus, whether the agency decided to separate the appellant class members for "workforce planning," because they did not perform critical duties related to immigration, national security, or public safety, or for any other reason not covered by 5 C.F.R. § 315.806(b) is immaterial to this appeal because the merits of that separation are not reviewable by the Board. *Id.* Further, as it existed at the time of the action, 5 C.F.R. § 315.803 referred to the broader concept of an employee's "fitness" for continued employment. Both the agency and OPM take the position that this concept permits an agency considerable flexibility in separating probationary employees for reasons other than individual performance and conduct, including as a measure to *avoid* the need for a RIF.[8] IAF, Tab 56 at 70, Tab 58 at 109. There is little support for the appellant's contention that the Board has the authority to either look behind the agency's proffered reasons for separating a probationary employee or limit the agency's authority to do so.

The next part of the appellant's argument that an agency conducts a reorganization whenever it separates an employee with no plan to replace them, because such action necessarily requires the agency to either eliminate or redistribute the functions performed by that employee – is also based on selective excerpts of the regulatory framework. The complete text defines a reorganization as "the *planned* elimination, addition, or distribution of *functions or duties in an*

---

[8] The prior version of the Federal Personnel Manual and OPM's Workforce Reshaping Handbook both refer to separating employees without appeal rights as a typical RIF avoidance measure. *See* Federal Personnel Manual, Chapter 351, at § 1-5(a) (1988); U.S. Office of Pers. Mgmt., *Workforce Reshaping Handbook*, Chapt. 1, p. 9 (Mar. 2017), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf. *See also Markland v. Office of Personnel Management*, 140 F.3d 1031, 1034 (Fed. Cir. 1998) (remarking that, until OPM publishes another interpretation of the RIF regulations, the FPM remains a valuable resource for that purpose).

*organization.*" 5 C.F.R. § 351.203 (emphasis added). The inclusion and placement of the adverb 'planned' is essential to the definition. *See, e.g. Moulton v. Office of Personnel Management,* 2023 MSPB 26, ¶ 15, *aff'd* 155 F.4[th] 1331 (Oct. 10, 2025) (discussing that statutory provisions must be read as a whole and in harmony). Similarly, 5 C.F.R. § 351.201 requires that the regulations "shall" be used when an agency "releases a competing employee" for the listed reasons "when such action will take effect *after* an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." *Id.* When read in its entirety, 5 C.F.R. part 351 requires an agency to follow a complex process for deciding how to allocate its employees and which ones will be released *after* it has first determined it has employees excess to its needs. The appellant's assertion that this process must be completed whenever an agency must "eliminate or redistribute" the functions of a departing employee – which it must necessarily do almost any time an employee departs, for any reason – is illogical, and in conflict with the plain meaning of the regulation.

Third, the agency admittedly retained untenured employees in positions deemed "mission critical," or that performed functions related to immigration, national security, or public safety, in accordance with the guidance from OPM. Tab 58, at 10, 15. The appellant argues that the fact of the exceptions pulls the separations into the definition of a reorganization because it reflects an intent to eliminate functions rather than individuals.[9] IAF, Tab 56, at 11, 22-25; Tab 63 at 12. Given the breadth of the mission and structure of the Department of Interior, I do not find its separation of these probationary employees a nonfrivolous allegation that it has reorganized or restructured functions unrelated to immigration, national security, or public safety. OPM provided similar

---

[9] The purportedly deliberative information sought by the appellant in discovery involved the agency's application of this exception. Because I find the application of the exceptions irrelevant to the existence of a RIF, the appellant's discovery dispute is moot.

exceptions to its hiring freeze policy and to eligibility for its deferred resignation program.[10]  IAF, Tab 56 at 41.  I find this evidence that the agency, in accordance with OPM's guidance and the policy of the incoming administration, was taking steps to shrink the size of its workforce using the authority available to it.  As discussed above, its actions began with identifying untenured staff serving a probationary period, which is an individual characteristic of the employee's appointment.  I find the agency's application of the allowable exceptions to employees within that broad category irrelevant to the existence of a reorganization.

Finally, the cases cited in support of the appellant's theory of RIF jurisdiction do not support their expansive reading of the regulations.  In *Von Zemenszky*, the Court held that the agency was required to comply with the RIF regulations rather than its internal process to release a Title 38 physician; there was no dispute that the agency had first determined it had staff excess to the needs of the medical center in question.  *See* 284 F.3d 1310, 1313.  *Holmes* addressed the agency's attempt to use the RIF regulations as a pretext for removing the appellant; the Board was not evaluating whether the agency was *required* to apply the RIF regulations, only whether it was *permitted* to do so based on its characterization of its action as a RIF.  *Id.*  *Holmes* accepted the agency's assertion that it was reorganizing because it proved it made organizational changes that increased the duties and grade of the position the appellant had held, displacing him from it.  *See* 41 M.S.P.R. at 616.  *Salo v. Department of Defense*, 122 M.S.P.R. 417 (2015), is a discontinuous furlough case, where there was no dispute that the agency furloughed its employees due to budget sequestration.  *Id*.  None of these cases involved a hiring freeze, or high-

---

[10] https://www.opm.gov/about-us/fork/faq/

level instructions to reduce the size of the workforce, or the agency releasing a group of untenured staff.

The Board did find that the RIF procedures were mandatory in *Robinson*; however, like in *Von Zemenszky*, the agency was admittedly restructuring. *Robinson*, 63 M.S.P.R. 307. In *Robinson*, the agency first consolidated work groups and then reassigned the appellants from redundant management positions with saved pay or grade, attempting to avoid the RIF procedures, which the Board found unlawful. *Id.* In *Losure v. Interstate Commerce Commission*, 2 M.S.P.B. 361 (1980), and *Huber*, the Board and the Federal Circuit rejected the agency's attempt to characterize its actions in eliminating and replacing the appellants' positions as a RIF because there was *not* a planned change to the agency's structure. *See* 2 MSPB at 364; 793 F.2d 284, 286 . In both cases, the agency's assertion that it acted pursuant to the RIF regulations was rejected because the employees proved they were selected for separation because of reasons personal to them – Ms. Losure's affiliation with disgraced managers and the *Huber* petitioner's Schedule A appointments. *Id.* In both cases, the agency made no significant changes to the duties or responsibilities of the positions the impacted employees held and replaced them after the sham reorganization was complete. *Id.* Finally, I note that while the situation in *Tippins* arose through the operation of a process that is only applicable to uniformed service members, the Federal Circuit found that the agency's actions in terminating retirement eligible military personnel in order to fill behind those employees with younger employees was not a "RIF," distinguishing the situation from a "reorganization" that would trigger a RIF under 5 CFR part 351 because the agency's actions started by targeting the characteristics of individual employees, specifically, the fact of their retirement eligibility. *Id.* *Tippins* and *Huber* are similar to the situation presented here, because the agency's action was premised on the character of their individual appointments; this appeal warrants a similar result.

I find the most logical reading of the regulations, and binding precedent, is that a RIF occurs when an agency *first* eliminates jobs and *then* reassigns or separates the employees who held those jobs, not the other way around. *See, e.g., Tippins*, 93 F.4th at 1375. There is no dispute in this appeal that the agency had not drafted a reorganization plan at the time it began complying with OPM's instructions to separate its probationers, and it had not abolished the positions they held before they were separated. The material fact is that the agency action undisputedly started with the character of the class member's appointment – probationary or trial period – exempting them only if the position they held was also "mission critical," as defined by the Executive Orders and OPM guidance. I find that the nature of the appointment the appellant class members held is an individual characteristic of the employee, not the position they held. *See e.g. Tippins*, 93 F. 4th 1370; *Huber*, 793 F.2d 284. That fact alone means that the agency action was not subject to 5 C.F.R. part 351.

<u>The appellant did not nonfrivolously allege that they were subjected to partisan political discrimination</u>

In its jurisdictional submission, the appellant argues in the alternative that the agency's action is reviewable pursuant to 5 C.F.R. § 315.806(a) as demonstrative of partisan political discrimination. IAF, Tab 56 at 36. In *Starkey v. Department of Housing and Urban Development*, 2024 MSPB 6 (2024), the Board clarified that an appellant asserting regulatory jurisdiction of 5 C.F.R. § 315.806(b) must nonfrivolously allege that partisan political reasons were the "but for" cause of their termination, and reversed the appellant's termination finding that the agency's reasons were a pretext for partisan political discrimination given the appellant's well-known support of partisan politics and a complaint from an industry group about her support of particular politicians and associated programs. *Id.* To nonfrivolously allege a termination was because of partisan political reasons, an appellant must nonfrivolously allege that the

terminations were based on the employee's affiliation with a political party, candidate, or campaign activities. *See Marynowski v. Department of the Navy*, 118 M.S.P.R. 321, ¶ 7 (2012).

The appellant class argues that it has met this burden because those separated were likely hired during the previous administration, and the "apparent motivation" for the separations "would be a belief that the terminated employees were disproportionately sympathetic to the political party of the previous administration, as compared to those hired during the current administration." IAF, Tab 56 at 36. The fact of being hired by a previous administration is insufficient to demonstrate an affiliation with a particular political party, candidate, or campaign activities. *See Marynowski*, 115 M.S.P.R. ¶ 7. While the agency separated the appellant class in furtherance of the goal of the current administration to reduce the size of the Federal workforce, acting in accordance with the goals of elected officials is also not partisan political discrimination within the ambit of 5 C.F.R. § 315.806(b).

There is no evidence that anyone harbored a perception that the separated employees supported the previous administration. The appellant submitted agency records demonstrating that it identified *all* its probationary employees and separated *all* of them unless they were involved in immigration enforcement, national security, or public safety. IAF, Tab 56 at 49-57, 70-92. The very fact that the agency indiscriminately separated the class members undermines any inference that they were selected because of their individual politics. I find the appellant's conclusory assertions insufficient to satisfy its jurisdictional burden. *See Baldwin*, 109 M.S.P.R. at 397 . The Board does not have jurisdiction to review the separations pursuant to 5 U.S.C. § 315.806.

<u>The appellant's claim that OPM's directive was unlawful does not provide the Board with Jurisdiction</u>

The appellant argues that the agency's actions in this matter violate the Administrative Procedure Act, as it was arbitrary, capricious, and outside of

OPM's statutory authority to order the agency to separate its employees. Agency actions have been found to be not in accordance with law when the individual taking the action lacked the legal authority to do so. For example, in *Hamilton v. U.S. Postal Service*, 58 M.S.P.R. 486, 487-88 (1993), the Board found that a demotion was not in accordance with law because the deciding official had retired from the agency prior to issuing the decision. In *McCollum v. National Credit Union Administration*, 417 F.3d 1332, 1339 (Fed. Cir. 2005), the Federal Circuit held that a removal was not in accordance with law because the only entity within the agency with the authority to authorize the appellant's removal never did so. In *Singh v. U.S. Postal Service*, the appellant argued that a higher-level official ordered the deciding official to demote him. 2022 MSPB 15 (May 31, 2022). However, the Board upheld the separation based on the deciding official's testimony that the decision was his and his alone. *Id.*

Here, in response to executive orders, OPM gave agencies direction framed as guidance and data calls from its acting director and through its CHCO Council. IAF, Tabs 56-58. However, the agency's responses to discovery and other declarations in the record identify the decision makers on separations as the individuals who signed the separation letters and its own human capital office, not OPM. IAF, Tab 56 at 60, 115-120. Regardless, a claim that an agency personnel action was "not in accordance with law" is not an independent source of Board jurisdiction. *See Davis v. Department of Defense*, 105 M.S.P.R. 604, ¶ 15 (2007). As discussed above, the probationary separations at issue are not within the Board's jurisdiction to review.

Conclusion

This appeal presents a question of law controlling the Board's jurisdiction, and there are no material disputes of fact. The employees were identified and terminated because of the nature of their appointments, not because the agency had abolished the positions they held. An eventual agency planned

reorganization or restructuring is not relevant to the appellant's current appeal rights.  Therefore, the appeal is DISMISSED for lack of jurisdiction.

## DECISION

The appeal is DISMISSED.

*Sara K Snyder*

FOR THE BOARD:    _____
Sara K. Snyder
Chief Administrative Judge

### NOTICE TO APPELLANT

This initial decision will become final on **May 5, 2026**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.  The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

# BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

## Criteria for Granting a Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

**Appx47**

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

## NOTICE TO AGENCY/INTERVENOR

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review. Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such

**Appx49**

review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular

**Appx50**

relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) <u>Judicial or EEOC review of cases involving a claim of discrimination</u>**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the

EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision becomes final</u> as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals

**Appx52**

for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Service    Interior Probationary Employees Class
Served on email address registered with MSPB

<u>Appellant Representative</u>

Electronic Service    Christopher Bonk
Served on email address registered with MSPB

<u>Appellant Representative</u>

Electronic Service    Brian Corman
Served on email address registered with MSPB

<u>Appellant Representative</u>

Electronic Service    Alice Hwang
Served on email address registered with MSPB

<u>Appellant Representative</u>

Electronic Service    Shannon Leary
Served on email address registered with MSPB

Appellant Representative

| | |
|---|---|
| Electronic Service | Rebecca Ojserkis<br>Served on email address registered with MSPB |

Appellant Representative

| | |
|---|---|
| Electronic Service | Kevin Owen<br>Served on email address registered with MSPB |

Appellant Representative

| | |
|---|---|
| Electronic Service | Emily Postman<br>Served on email address registered with MSPB |

Appellant Representative

| | |
|---|---|
| Electronic Service | Anisha Queen<br>Served on email address registered with MSPB |

Appellant Representative

| | |
|---|---|
| Electronic Service | Daniel Rosenthal<br>Served on email address registered with MSPB |

Appellant Representative

| | |
|---|---|
| Electronic Service | Charlotte Schwartz<br>Served on email address registered with MSPB |

Appellant Representative

| | |
|---|---|
| Electronic Service | Joseph Sellers<br>Served on email address registered with MSPB |

Appellant Representative

Electronic Service     Alisa Tiwari
Served on email address registered with MSPB


Agency Representative

Electronic Service     Stacy Biney
Served on email address registered with MSPB


Agency Representative

Electronic Service     Maria Iliadis
Served on email address registered with MSPB


Agency Representative

Electronic Service     Rachel Wieghaus
Served on email address registered with MSPB


Statutory Intervenor

Electronic Service     Patrick Ehler
Served on email address registered with MSPB


Statutory Intervenor

Electronic Service     Eyana Esters
Served on email address registered with MSPB


Secondary Appellant

U.S. Mail     Allison Keating
50 Lawrence Road
Weare, New Hampshire 03281

**Appx56**

Secondary Appellant

U.S. Mail            Matthew McAnulty

2790 W Forecast St.

Meridian , Idaho 83641

<u>Secondary Appellant</u>

U.S. Mail            Samuel Peterson

PO Box 214

Coulee Dam, Washington 99116

| 03/31/2026 | *Maria Sunga* |
|:---:|:---:|
| (Date) | Maria Sunga |

**Appx57**

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,145 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

July 7, 2026

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett